The Southern Life Insurance Company *vs.* Wilkinson *et al.*

---

THE SOUTHERN LIFE INSURANCE COMPANY, plaintiff in error, *vs.* MARY V. WILKINSON *et al.*, defendants in error.

1. Where suit is brought by a widow and child on a life policy, insuring the life of the husband and father, and the plaintiffs are the joint beneficiaries under the policy, the admissions of the widow are competent evidence for the defendant on the question of misrepresentation made in the application for insurance.

2. The rule that a witness, who is not an expert, must give the facts on which he rests his opinion before he will be allowed to state what that

The Southern Life Insurance Company *vs.* Wilkinson *et al.*

opinion is, applies to one who is not a physician, and by whom it is proposed to prove the condition of the health of a party.

3. The grounds on which the court refused to withdraw the testimony of the witnesses, Sasser and Willis, cannot exist at any future trial of the case, and as the objection may be cured in time hereafter it is not necessary to consider these exceptions further.

4. The same may be said as to the defective notice to produce the family bible. Such defect may be cured by another notice. We do not think the court erred in holding that a notice to produce the "father's family bible," would not force the production of the one described by the witness in this case.

5. But a bible containing a family record, in the handwriting of a deceased daughter, which remained in the possession of the mother until her death, and then went into the possession of another daughter, from whom the witness (a son) got it, is competent evidence on the question of the age of one of the children of that mother. The fact that the witness states that he did· not acknowledge the record as correct, and that his mother said it was copied by a sister of witness, and it was not considered correct by the family, does not render the record incompetent as testimony. Such statements of the witness may be considered by the jury in determining the weight to be given to the record, and it is subject to be weakened or strengthened by all the evidence in reference to it.

6. It was not error for the court to refuse to charge the jury that a delay for several months to give notice of the death of the party whose life was insured was a failure to give notice in a reasonable time.

7. Nor was it error to charge the jury that "in considering the question as to the false or fraudulent statement made by the insured, you may consider, if you shall think it throws light on the question, how and by whom the insurance was gotten up, whether at the instance of the insured or by the agent of the company." All the surrounding circumstances in all contracts where fraud is charged, are matters for the consideration of the jury which is to pass upon it.

8. Where evidence is introduced upon the point of misrepresentation as to the age of the party whose life is insured, which is competent, and is to be considered and weighed by the jury in determining the real age of the party, the court should not in its charge, by argument, weaken the weight of the evidence, and say that a portion of the testimony thus relied on does not prove what the party introducing it claims that it does show, and has a right so to argue, the more especially when that portion so pointed out has to be taken in connection with another part, in order to get its full force.

9. When the question put in the application is whether the applicant "ever had any serious illness, local disease, affection, or personal injury," it was not error for the court to charge, that the word "serious"

The Southern Life Insurance Company *vs.* Wilkinson *et al.*

qualified each of the words, "local disease," "affection" and "personal injury."

10. Under the provisions of the Code, applications for insurance must not only be made in the utmost good faith, but the representations contained therein are covenanted to be true by the applicant. Not that they are warranties so as to vacate the policy, if any of them, whether material or not, are not true; but any variation in them from what is true, whereby the *nature* or *extent* or *character* of the risk is changed, will, if the policy makes them the basis of the contract of assurance, void the policy, whether they are or are not wilfully and fraudulently made.

Insurance. Admissions. Evidence. Witness. Experts. Production of papers. Charge of Court. Warranty. Before Judge HILL. Bibb Superior Court. October Adjourned Term, 1873.

Defendants in error, the widow and son of the assured, declared, in an action of debt on a policy on the life of the husband and father for $10,000 00. Plaintiff in error pleaded the general issue, and that the policy was null and void, in that deceased made misstatements as to his age, and also as to his health, stating that he was in good health and free from any symptoms of disease at the date of his application, and that he never had any serious illness, local disease, affection or personal injury, "except a slight case of pneumonia in January last," whereas he did have symptoms of• disease and was not in good health at the date of the application, and had had liver disease, etc.

The policy contained this stipulation : "The statements and declarations of the assured, made in the application for this policy, and upon which it is issued, are hereby made a part of this contract of insurance, and if any of said statements or declarations be found untrue, the policy shall be null and void." It also reads : "In consideration of the representations made in the application for this policy, and of the sum of $225 34, to them duly paid by Mary V. Wilkinson, etc., do issue," etc.

The application contains this stipulation : "It is hereby declared that the above are true and fair answers to the fore-

going questions. And it is agreed by the undersigned that the above statements shall form the basis of the contract for assurance, and also that any untrue or fraudulent answers, or any suppression of facts in regard to the above named person's health, will render the policy null and void," etc.

The policy and application were in evidence, also a receipt of $226 26, first annual payment.

Three letters from Dr. Mitchell, general agent, of date June 13th, and August 4th and 9th, 1870.

The first informs the company that he fears the policy is a bad risk and fraud was practiced, but would investigate further.

The second that he has investigated, and at the time of his application the risk was good; the rumors were originated in malice to deceased, and perhaps to the company; looked reasonable because he was so soon taken sick.

The third announces Wilkinson's death.

The oral evidence was as follows:

1st. J. T. Wilkinson, brother of deceased, and executor: Plaintiffs are wife and only child of deceased, who died 13th August, 1870; first saw policy in possession of plaintiff in fall of 1870; did not give it to him when she did the other papers, but afterwards did, to collect; applied to the company by letter, and they sent blank to Leman, agent, to prove death; saw his brother buried; witness had a bible which had record of birth in it; not his father's bible; record in handwriting of Mrs. Sandford, a half-sister; this bible was in possession of his mother till her death, then in that of his sister, Miss Wilkinson, from whom he got it and delivered it to Colonel Whittle, plaintiff's counsel, who now has it; his mother said it was copied by a half-sister of witness and was not considered correct by the family; witness has his mother's bible—Douay edition—and it has no record; has not his father's bible; never knew anything about it, if he ever had one; only knows his age from the record which they thought wrong, and which makes him fifty-four or fifty-five, which he

The Southern Life Insurance Company *vs.* Wilkinson *et al.*

thinks about his age; was five or six years old when father died.

2d. Enoch C. Brown: Knew deceased several years before the war, and served three years in the army with him; messed with him, was sick a good deal, constantly took liver pills; knows this of his own knowledge, and from being told so by Wilkinson; he complained of ill health before, during and after the war, up to the time of his death; whenever they met he complained; met him frequently in Milford after the war; always heard him complain of affection of the liver and dyspepsia, from the time he first knew him up to his death; was very sick a short time before February, 1870, of severe pneumonia, and condition feeble in February, 1870; physicians prescribed medicine for dyspepsia for him, and he took it in witness' presence; witness was troubled with it himself.

3d. Dr. C. H. Paul: Knew deceased from 1839 until his death; attended him and treated him in early part of 1860 for pneumonia; afterwards, in the same year, for affection of the liver. Deceased told him before 1870, that he was taking Simmon's Liver Regulator and Profit's Liver Medicine. In 1869, as he remembers, deceased told him he was in bad health and didn't know what was the matter with him, and that he had been taking the patent medicines; did not then prescribe for him, but did, in 1870; his disease was hypertrophy and induration of the liver; visited him three or four times; treated him for that disease, and advised him to go up the country; been practicing medicine twenty years.

J. G. Sasser: General health good; saw him once to six and seven times a week; lived in a mile of him; don't think he could have had a *badly* diseased liver without witness' knowing it.

4th. A. L. Willis: Knew him intimately for four years; saw him two to four times a week; general health good; never knew him *permanently* ill of any disease; died in August, 1870, or latter part of July; about forty-three years old when he made application; signed certificate as his friend; true, to the best of his knowledge and belief.

5th. J. L. Varner: Was traveling agent under Dr. Mitchell, general agent; called and solicited insurance from disease, as was usual in the business; canvassed Southwest Georgia; got over seventy-five policies; considered him in good health; good a subject as ever insured; answers made by deceased; witness believed them true, from his appearance of good health, and his character and reputation in neighborhood; sent company over $3,000 00 insurance money that winter.

6th. Dr. George M. Willis: Is practicing physician; examined Wilkinson for company; policy fairly obtained on Wilkinson's part; had known Wilkinson two years; attended him in January, 1870, for attack of pneumonia; was convalescing from it on 18th February, 1870, when application was made; too feeble to do hard work; not entirely well, but out of danger; said he did not think his application would be received; got medicine from witness in May to act on his liver; but, from his own examination, and never having heard of any physician pronouncing his liver diseased before 18th February, thinks it was, at that time, sound.

7th. Thomas Farrow: Knew Wilkinson four years before his death; was informed that he enjoyed good health till latter part of 1870 or first of 1871; understood he had pneumonia, which ran into consumption or liver disease—don't know which.

The jury found for defendants in error, $10,000 00, with interest from 10th of April, 1871.

Plaintiff in error moved for a new trial upon the following grounds, to-wit:

1st. Because the court erred in ruling out the evidence of James W. Warren, that he "had a conversation with Mary V. Wilkinson, plaintiff, in the summer of 1871, in reference to a policy of insurance upon the life of her husband, issued by the Southern Life Insurance Company." In that conversation she said that her husband "had liver disease at the time of his application for said policy, and had suffered with it for a long time previous thereto, and that he expressed the belief that his application would be rejected by the company," upon

the ground that " where there are several parties with no joint interest, the admissions of one cannot be received, unless the issue is of such a character that the effect of the admission can be restrained to him alone."

2d. Because the Court erred in ruling out the following testimony of Enoch C. Brown in answer to second interrogatory, "when he was a young man he appeared healthy, but when he matured in life his diseased condition developed;" also in answer to the third interrogatory—"I was sick myself, and was told my liver was affected; his symptoms were like mine, and the same kind of medicine was taken by us."

3d. Because the Court erred in admitting the following testimony of J. G. Sasser which was in reply to the second cross-interrogatory, as follows : " Can you say, of your own knowledge, that W. W. Wilkinson was a healthy, sound man in 1870, or at any time during the time you knew him ?" "Do you not know that respectable physicians pronounced him unsound in 1870 and 1871 ?  Could he not have been diseased of the liver without you knowing it ?"  Answer : " To the best of my knowledge and belief he was, up to his last fatal illness, except a light attack of pneumonia in January or Febuary, 1870.  I do not know of any respectable physician pronouncing him unsound before his last illness.  I don't think he could have had a badly diseased liver without my knowing it and hearing some complaint."  Also, in admiting to the jury, the reply to the third direct interrogatory, which was: "What was the general health of Wilkinson ?  Did you ever hear of his being permanently ill of any disease ?"  Answer : "His general health was good.  I never did before a short time before he died."

4th. Because the Court erred in admitting to the jury the following evidence of A. L. Willis, as follows: "I do not think a man of his complexion could have had a badly diseased liver without my detecting it in his looks, or hearing him complain in some way."

5th. Because a subpœna *duces tecum,* having been served upon James T. Wilkinson, dated the 7th day of March, 1873, to

produce on the trial "the family bible of the father of William W. Wilkinson, containing the record of the births of the family," and the said J. T. Wilkinson having, in response thereto, sworn that there was no family bible of the father of said W. W. Wilkinson, but that there was a bible purporting to be such a record which was in his mother's possession up to her death, and then went into his sister's, Miss ...... Wilkinson's possession, from whom he, witness, got it, but they did not recognize it as containing a correct record of the births of the family; that the record was neither in the handwriting of his father nor of his mother, but he believed in the handwriting of Mrs. Sanford, a deceased half-sister, and that he had given it to Mr. Whittle, the plaintiff's counsel; and that he, witness, was acting as agent for plaintiffs, and managing this case for them; the court, under this state of facts, erred in not requiring the said bible to be produced in court by Mr. Whittle, who acknowledged that it was in his office, just across the street from the court-house, defendant's counsel stating that they, expected to prove by said bible, and the record therein, that the assured's age was greater than forty-two by several years.

6th. Because notice having been served upon the plaintiff's counsel on the 7th of March, 1873, to produce on the trial "the family bible of the father of William W. Wilkinson, containing the record of the births of the family," under the facts set forth in the seventh ground of this motion, the court erred in not requiring Colonel Whittle to produce the bible in his possession, and at his office, across the street.

7th. Because the court erred in refusing to charge the jury the following written request of defendant's counsel: "That the jury must be satisfied from the evidence that the proof of death is properly and legally made out, and in a reasonable time, and that a delay of several months is not a reasonable time."

8th. Because the court erred in charging the jury on the point of false or fraudulent statements of insured as follows: "In considering the question as to false or fraudulent statements made by the insured, you may consider, if you shall

The Southern Life Insurance Company *vs.* Wilkinson *et al.*

think it throws light on the question, how and by whom this insurance was gotten up, whether at the instance of the insured, or by the agent of the company."

9th. Because the court erred in charging the jury, on the point of false representation of the age of insured, as follows: "The defendant claims that the insured made a false statement in his application, as to his age, and represented himself as several years younger than he actually was; and that he knew his true age, and did not make the statement as to his age in his application believing it to be true. If the defendant has proved this to your satisfaction, then I charge you that such false representation as to age is material, and will vitiate the policy. As before stated, defendant must prove this, but, gentlemen, what witness has sworn that he was over forty-two? It is not proved by proving the age or ages and number of older brothers of the insured, unless there is also proof of the time intervening between their birth or births, and that of the insured. Nor does the statement of the insured in his application, as to the ages of such older brothers, prove this. The insured could not have personal knowledge of the ages of persons older than himself, and if he made a mistake in his application as to their ages, it would not be of such materiality as to avoid the policy."

10th. Because the court erred in charging the jury on the tenth question, whether insured had ever had any serious illness, local disease, affection, or personal injury; if so, of what nature and when was it? as follows: "Defendant further claims that this policy is made void by the answer of the insured to question number ten, in application, in this, that the insured is required to state what serious illness, local disease, affection or personal injury he had had in his past life. To this, it is claimed by defendant, that insured replied, 'a slight case of pneumonia in January previous,' without more, and this is claimed by defendant to have been fraudulent, and that the policy is thereby avoided. These expressions in the question must mean not only serious illness, but *serious* local disease, or serious affection, or serious personal injury. Local

disease means the disease of some organ or part, as the lungs, stomach, bowels, or the like; but it is not every belly-ache or trivial organic derangement in his previous life that the insured must remember and put down in answer to this question. This answer calls for the putting down in answer thereto such *serious* illness or local disease, or affection, or personal injury, as by their intensity or duration have impaired the system, and thereby diminished the chance of the duration of the life of the insured, and would thereby increase the risk of the insurer, or such as by the tendency of the system to their future recurrence would diminish the chances of life and increase such risk; something that would confine a man to his bed or room, or lay him up. A man could not have any serious illness who was in camp fighting and exposed to the hardships of such a life. It means serious chronic disease. I charge you that taking liver pills, without more, don't prove that Wilkinson had such a disease. And if you shall find from the proof that his family physician made similar answers, in substance, to these matters that the insured did, I charge you to consider that as bearing on the question whether the insured did not believe he was truthfully making all the answers thereto that the question properly required of him. But if, in accordance with these instructions, you shall find such answers to be false, and that the insured did not believe them to be true, then I charge you that the policy, for this cause, would be void, and you will find for the defendant."

The motion was overruled, and plaintiff in error excepted.

JACKSON, NISBET & BACON, for plaintiff in error.

WHITTLE & GUSTIN, for defendants.

TRIPPE, Judge.

1. The question made in the third ground of the motion for a new trial, is, as to the admissibility of the testimony of J. W. Warren, by whom it was proposed to prove certain ad-

missions of Mrs. Wilkinson, one of the plaintiffs. This is the first point we notice—the first and second grounds being generally that the verdict is contrary to law and the evidence, which, under the judgment we render, it is unnecessary to consider. The court, on the trial, ruled out these admissions. In this we think there was error. The policy of insurance recites that the premium was paid by the beneficiaries thereof, the plaintiffs. It is made payable to them jointly, and they bring a joint action to recover the amount of insurance. The Code, section 3784, provides that "the admission of a party to the record is admissible in evidence, when offered by the other side, except in the following cases: 1st. In case of a mere nominal party or naked trustee. 2d. When there are several parties with no joint interest, the admission of one cannot be received unless the issue is of such a character that the effect of the admission can be restrained to him alone." Other exceptions are stated which do not affect this question. There is nothing in this enactment which changes the old rule as laid down by Greenleaf and Phillips, so far as it is applicable to the point we are considering, but it is rather a statutory indorsement of it. Greenleaf says "if the parties have a joint interest in the matter in suit, whether as plaintiffs or defendants, an admission made by one is, in general, evidence against all:" Gr. Ev., 1, 174. In 1 Phill. Ev. 378, it is thus stated: "It appears to be a general principle that in a civil suit by or against several persons who have proved to have a joint interest in the decision, a declaration made by one of those persons, concerning a material fact within his knowledge, is evidence against him and against all who are parties with him in the suit." It is admitted that the interest must be *joint*, and that a mere *community* of interest, as Mr. GREENLEAF styles it, is not sufficient to render the admission of one party evidence against his co-party, and the cases of co-executors, tenants in common, and trustees are given to show this. In such cases there is not a joint interest that will make one individually liable on the declaration of his co-executor, co-trustee or co-tenant. But where the parties to a

suit, either as plaintiffs or defendants, set up in a joint suit a joint claim, resting on one and the same contract, with an issue applying to them jointly, the declarations or admissions of one are evidence against his co-plaintiff or co-defendant: 8 Bing., 309; 1 Stark. R., 488; 17 Mass., 222; 23 Maine, 69; 4 Harr. & M., 346; 8 Mo., 627; 9 Humph., 750; 4 Yates, 532.

2. No witness who is not an expert as to the matter about which he is testifying, can give an opinion unless he states the facts on which that opinion is founded. This rule applies to one by whom it is proposed to prove the condition of the health of a party. We did not understand counsel in the argument to disagree on this point. Tested by this rule, it was not competent for the witness, Brown, to state that when the person, about whom he was testifying, "matured in life, his diseased condition developed," especially when it was intended thereby to prove that he suffered from a particular disease. He should have gone further and stated the facts as to the development of that disease. Nor was it sufficient to let it in, when the witness said "*he was told* that his (witness') liver was affected," and that the party referred to "had symptoms like his" (witness'.) This was too uncertain and indefinite. He neither said it was true that he himself had a diseased liver, or stated anything showing it, or even gave his own opinion that it was so. His only authority was, that he was told it. By whom? Had he stated that it was by a physician who attended him and administered to him for that disease, the question would be different. But it would be too loose a rule to allow testimony like that to be received, to establish the fact that a person at a particular time had a particular disease.

3. It is only necessary to say in reference to the testimony of Sasser and Willis that the grounds upon which the court put the refusal to rule out or exclude their testimony, need not exist at any future trial. It may be said that if a party objects to the answers of a witness to cross-interrogatories put by himself, the proper rule is to withdraw those questions. We do not say that by not withdrawing them he loses all

right to move afterwards to have them and the evidence with-drawn from the jury by the court: 10 *Georgia*, 186 ; 13 *Ibid.*, 511. We can very easily conceive where the other party may have acted on that part of the testimony in the further progress of the cause, and perhaps rested his case on it—that, in a certain stage of it, to-wit: after the argument is concluded or the charge given to the jury, or all witnesses dismissed, the question would be largely within the discre-tion of the court. As this difficulty will doubtless not occur hereafter, nothing now need be said on this point.

4. The same may be said as to the notice to produce the family bible. Any defect in it may be cured by another notice. We do not think the court erred in holding that a notice to produce the "father's family bible," did not require the production of the one described by the witness.

5. Was the bible which was described by the witness ad-missible? As the court put its refusal to grant the new trial on the ground that it was not, and as the question was dis-cussed in the argument and will certainly be presented again, we will consider it. Section 3772 of the Code provides that "pedigree, including descent, relationship, birth, marriage and death, may be proved either by the declarations of deceased persons related by blood or marriage, or by general repute in the family, or by.genealogies, inscriptions, family trees, and similar evidence." We know of no rule requiring that the "genealogy, inscription, family tree, or similar evidence," should be actually written by the father or the mother. If the registry is recognized by either as such—that is, by the mother, the father being dead—is kept by her, and after her death goes into the possession of a daughter, is in the hand-writing of another daughter, who is deceased, and is still pre-served in the family, it comes within the terms "similar evi-dence," and is certainly equivalent to "declarations of a de-ceased person related by blood or marriage," even if it be not competent under other words used in the section quoted. The fact that the witness who stated all this added that the mother said it was copied by the daughter, and that he and the fam-

ily did not acknowledge the record as correct, does not render it incompetent. He did not say in what it was not considered correct, nor did he say that the mother, or the daughter in whose handwriting it was, did not consider it correct. The facts stated by him might be considered by a jury in determining the weight to be given to the registry as evidence, for it certainly is not conclusive, and it is subject to be weakened or strengthened by all the proof in reference to it.

6. The question as to giving notice of the death of the person whose life was insured to the company within a reasonable time, was one for the jury, under proper instructions, to be given them in charge, and was not to be absolutely passed upon by the court. It was not error to refuse to charge as requested by defendant on that point.

7. Nor was it error to charge the jury, that "in considering the question as to fraud, you may consider if you think it will throw any light on the question, how and by whom the insurance was gotten up, whether at the instance of the insured or by the agent of the company." It was only saying that they might consider the circumstances attending the whole transaction. The matter referred to might be of greater or less weight, as the jury should weigh it in the light of all the other evidence.

8. We think the court went too far in its charge to the jury, as excepted to in the eleventh ground of the motion for a new trial. The defendant introduced evidence to show that misrepresentations had been made in the application as to the age of the insured. Without giving an opinion as to the strength or force of that testimony, we say the court below should have refrained from charging that a portion of that testimony did not show what the defendant claimed it did. The application stated the age of the insured to be forty-two, and two of his brothers to be forty-four and forty-six, respectively. That indicated pretty strongly that there were two years between their several births. From the testimony of one of those brothers, it seemed he was about four years older than the application made him. If the difference between

applicant's age and that brother's was represented by him to be four years, or two years, (and did not defendant have the right so to argue?) would it not suggest that the applicant was as much older than the age stated by him, as his elder brother was proved to be over the age which was given to him in the application? Certainly, when all this testimony is looked to, the charge of the court went beyond its powers, as indicated in section 3248 of the Code.

9. One of the questions in the application was, whether the applicant "ever had any serious illness, local disease, affection, or personal injury." There was no error in the construction given to this by the court. The charge was, that the word "serious" applied to and qualified each of the terms "local disease," "affection" and "personal injury." Any other construction would have required the applicant to comply with an impossibility, and would be trifling with his rights and with common sense. To have asked one over forty years of age to state every "affection," "local disease" or "personal injury" which he might have had or endured in his lifetime, whether serious, or light and trifling, would be absurd. No one could possibly meet such a question, and it would make the catalogue nonsense as to all practical purposes when it appeared. The object of the question was patent, and a proper one, and the direction given by the court meets it.

10. We are aware of the strict rulings in most of the decisions, that where the statements of the insured are incorporated into the contract of insurance, and are made the basis of it, they are held to be warranties: 6 Cush., 341; 1 Bigelow, 252; *Ibid.*, 173; *Ibid.*, 76; 1 C. & P., 360; 2 Comp. M., 348, and numerous others. In many of these it was held that the question of the materiality of the representations or misrepresentations was a matter that could not be set up by the insured or the beneficiaries in the policy, that when they amounted to warranties, the truth of them was the only question, and it could not be said that they were unimportant or immaterial so as to avoid the effect of their being untrue. We think the provisions of our Code determines this ques-

tion. It is therein provided that "every application for insurance must be made in the utmost good faith, and the representations contained in such application are considered as covenanted to be true by the applicant. Any variation by which *the nature or extent or character of the risk is changed,* will void the policy:" Section 2802. The next section adds: "Any verbal or written representation of facts by the assured to induce the acceptance of the risk, if material, must be true or the policy is void." Under these and the other provisions in the Code on this subject, we do not think that such representations as we are considering amount to warranties, so as that the policy will be vacated if any of them are untrue, whether material or not. But the proper construction is that if there be any variation in them from what is true, whereby the nature or extent or character of the risk is changed, the policy, if it makes them the basis of the contract of assurance, will be void, and that this will be so whether they are or are not wilfully or fraudulently made.

Judgment reversed.