## NORTHWESTERN LIFE INSURANCE COMPANY *v.* MONTGOMERY *et al.*

1. A clause in a life-insurance policy, that "if . . death shall occur later than three years from the date hereof, the liability of the company shall not be disputed on account of any statement in the application, except in case of actual fraud," precludes the company, where the death occurs more than three years after the issuance of the policy, from setting up merely that statements made as warranties in the application for insurance were untrue, or that there was constructive fraud therein, but leaves it free to set up actual fraud.

2. Where it is shown that a material statement made in such application was false, that its falsity was known to the insured at the time it was made, that it was made with a view to procuring the insurance, that the company had no notice of its falsity, and that the company acted upon it to its injury, the law will conclusively presume an intent to deceive, and a case of actual fraud will be made out, although the insured may not have really intended to prejudice the rights of the company.

3. The assignment of a policy of life-insurance, made with the consent of the company, does not preclude the company from setting up as against the assignee fraud in the original application, of which the company had no notice at the time of such consent.

Argued November 14, — Decided December 18, 1902.

Action on insurance policy. Before Judge Henry. Floyd superior court. June 17, 1902.

From the evidence it appeared that Morton was approached by a soliciting agent of the insurance company and induced to apply for insurance. Before the insurance policy was issued, he was examined by a physician employed by the company, who read to him, from a printed form of application, a series of questions and wrote in the application the answers given, after which Morton signed the application. The material parts of the application are as follows:

Part I. Q. Do you understand and agree that no statements, representations, or information made or given by or to the person soliciting or taking this application for a policy, or to any other person, shall be binding on the company, or in any manner affect its rights, unless such statements, representations, or information be reduced to writing and presented to and approved by the officers of the company at the home office? Answer. I do. —It is hereby declared and agreed that all the statements and answers written in this application, marked Part I, including those to be made to the Medical Examiner, marked Part II, are warranted to be true and full and fair answers to the questions, and are offered to the company as a contract [?] for the contract of insurance, which shall not take effect until the first premium shall have been actually paid during the lifetime of the person herein proposed for insurance, and while he is in good health. (Signed by the insured.)

Part II. Question. When did you last consult a physician, and for what? A. 1895, May, for a cold. —Have you fully recovered? Yes. —Give name and address of the physician who attended you. Dr. D. T. McCall, Rome, Ga. —Give name and address of your usual medical attendant. Dr. T. M. Shaw, now of Rome, Ga. —Are you willing that your physician be consulted respecting your health? Yes. —In what form and to what extent do you use tobacco? Don't use it at all. —Have you had since childhood any of the following diseases or disorders? Mental derangement or nervous disease? No. —Spitting or raising of blood? No. —Vertigo, dizziness, or unconsciousness? No. —Fits, epilepsy, or convulsions of any kind? No. —Sunstroke or fainting spells? No. —Palpitation or any disease of the heart? No. —Have you had since childhood any chronic or constitutional dis-

ease, or severe injury, not fully set forth above? No. —Have you any reason to believe that you are not in good health at the present time? No. (Signed by the insured.)

Accompanying the application was a report of the examining physician as to the results of a physical examination of the applicant, giving certain details of the examination and tests applied, and certifying that there was no indication of disease and nothing unfavorable in his general appearance; that he had no predisposition to any local or constitutional disease; that the examiner believed from his appearance and statements that he uniformly enjoyed good health; that he had personal knowledge of the habits, past and present, and of the general standing of the applicant; that he had known the applicant intimately for six years; that he had no reason to suspect unacknowledged over-indulgence in the use of stimulants or of narcotics, then or in the past; that he could not discover anything unfavorable in his manner of living, physical condition, or personal or family history, not mentioned; and that he unqualifiedly recommended the acceptance of the risk for a life-policy.

The policy was dated October 30, 1895. The insured was adjudged insane in August, 1898, and was committed to an insane asylum, where he remained until his death, which occurred in May, 1900. No inquiry or investigation as to his health, other than that mentioned above, was made on the part of the insurance company until after his death. The company, in issuing the policy, relied on the statements in the application, and on the report and recommendation of the examining physician; and he and the company's agents through whom the policy was issued testified that they did not know that any of the statements made in the application were untrue. Dr. D. T. McCall testified: I treated Mr. Joseph Ross Morton for a disease in the early nineties. He had been smoking a great deal of cigarettes; I attributed it to that. He had nervous trouble from it. He had what we call "tobacco heart;" it was very rapid, and I kept him there with me a night or two. . . I was with him a great deal, trying to find out the main trouble. He would have nervous attacks. He would be sitting down talking to you, and there would seem to be a stagnation of the blood all at once; he would apparently have congestion, and he would lay hold of anything that happened to be around, and his muscles would

become contracted so he would hold it tight. It would soon pass off. His conversation would commence right where he left off; wouldn't seem to notice that he had an attack at all. His mind would be absent at the time. Would commence his conversation right where he left off. He would laugh. The laughing was the most I noticed. I never saw him fall only the latter part of the time I knew of him. . . I was standing talking to him, he went down on his all fours, and I caught hold of him; that was away up in 1898, somewhere along there, just before he went to the asylum. In reply to the question whether, in his opinion, Morton was affected with any mental derangement or nervous disease, the witness said: Only that. His mind seemed to be perfectly clear at all times afterwards, except when that was on him. I say he had that nervous disease. It was a sort of climax of the nervous system when he arrived at that point, was my diagnosis, sustained by the authorities. I assign as the cause of that nervous derangement, as I said, smoking. I treated him for nothing except that trouble. I treated him two or three years, and he seemed to improve under the treatment. He went to Dr. Battey along afterwards, and two or three others, after I treated him, and he would consult me right straight along all the time. I began treating him in the early nineties. . . I suppose it was 1892 or 1891, along there somewheres. I stopped seeing him in 1893 or 1894, somewhere along there, and then I treated him afterwards. There was an interval of a year or two that I didn't treat him. I began treating him again in 1896, I think, or 1897, along there. There was another trouble then, though; there was a hemorrhage of the lungs; he had an abscess of the lung and several hemorrhages from it. He got better, got a great deal better, and missed having any attack for a good while. When I first saw him they were every day or so, or every night nearly, any time. He was subject to them at any time, but they got so they would be once a week or once a month, and so on, until I thought they had about stopped. There was an absence of the mind. I don't think he knew anything at all when these attacks were on him. I don't think it was true epilepsy; not convulsions; he didn't convulse. We would term it partial epilepsy. He didn't faint. His heart was regular but rapid. His heart was regular, as I told you. I didn't find any organic trouble about his heart. I may say that he had functional trouble

of the heart, sympathetic trouble from other troubles of the nervous system.    It was a protracted trouble, or chronic.    I told him that I was satisfied it was from using tobacco, from the nicotine. I suppose that he knew it or he wouldn't have come to me to treat him.    The first time he came, my recollection is that it wasn't long till he had one in my presence.    Have seen him have those spells a number of times.    I advised him that all his trouble resulted from excessive use of tobacco, smoking cigarettes. . . He quit tobacco after that, under my advice.    Under my treatment his general condition improved, and he had less frequent attacks.    I thought he was about well. . . I don't think that I ever informed him, as a physician, that he had epilepsy, or any of those serious disorders that have been inquired about.    I told him this, that it might lead to epilepsy or something of the kind, — that is, the excessive use of cigarettes.    He did quit the use of cigarettes, so far as I know.    I talked with him about his having these unconscious spells, and told him that I had seen him have some of them.    I advised him that it was a serious trouble with him, and that it was caused by tobacco, that it would endanger his health.    I don't know exactly what I did tell him, but I told him a good deal.    I explained the result.    His mental derangement and his going to the asylum might be attributed to his nervous trouble.    I believed this mental trouble that he suffered from and that I treated him for for a number of years would eventually unbalance him.    I considered that he was in serious trouble all along during the time that I treated him, and I advised him to that effect.    His was a very serious case.

Other witnesses testified as to nervous attacks and unconscious spells of the insured, that he said he thought they were caused by smoking cigarettes, and that he stopped smoking.    Several witnesses testified to his good character.   The policy contained a clause providing that " If the age has not been understated and death shall occur later than three years from the date hereof, the liability of the company shall not be disputed on account of any statement in the application, except in case of actual fraud."

*Dean & Dean*, for plaintiff in error, cited, as to false statements and presumption of intent to deceive: 20 Fed. 594; 81 N. W. 807; 74 N. W. 5; 64 Mo. 201; 139 Mo. 627; 46 N. J. Law, 380, 388; 6 Ind. App. 533; 120 Ill. 469; 1 Ill. App. 177; 22 Id. 457; 30 Id.

294; 59 Mich. 341. As to the meaning of "actual fraud:" 72 *Ga.* 331; 104 *Ga.* 790. On the effect of the assignment of the policy, as to defenses: 3 Joyce, Ins. §§ 2308, 2326; 45 Me. 307; 10 Beav. 335.

*W. J. Neel* and *Seaborn & Barry Wright*, contra, cited, as to actual fraud: Civil Code, § 4025; 23 Beav. 535; 47 Am. Dec. 408. Burden of proof: 102 *Ga.* 143. Character of the insured: 102 *Ga.* 720 (5); 18 *Ga.* 495; 81 *Ga.* 589. Construction of contract: 107 *Ga.* 121; 104 *Ga.* 256 (2). Incontestable clause: 104 *Ga.* 268 – 70; 25 L. J. (Exch.) 129 – 31. Duty of insurer: 101 *Ga.* 594; 104 *Ga.* 272. Rights of transferee: 64 Iowa, 507; 3 Joyce, Ins. § 2308.

SIMMONS, C. J. Suit was brought against the Northwestern Mutual Life Insurance Company on a policy of insurance issued on the life of Joseph R. Morton. The defendant in its answer set up certain alleged false and fraudulent statements made by the insured in his application for insurance, by which the company was induced to issue the policy. On the trial the case was submitted to the jury on the sole issue of fraud as affecting the policy under its terms. It appeared that Morton in his application stated that he had not since childhood had any mental derangement, nervous disease, dizziness, unconsciousness, fits, epilepsy, convulsions of any kind, or any disease of the heart, and had no reason to believe that he was not in good health at the time the application was made. By the terms of this application, which was signed by Morton, all the statements made therein were warranted to be true and were offered to the company as a consideration for the contract of insurance. The evidence showed, without question, that most of the statements just set out were false; that Morton had suffered from and was subject to frequent fits; that the physician he consulted ascribed these fits to the result of excessive smoking, telling Morton that he had "tobacco heart;" that, under the treatment of this and several other physicians, Morton improved, and was apparently rid of the trouble at the time he applied to the defendant for insurance; but that subsequently the trouble returned, and Morton eventually died in an asylum for the insane. It was also shown that the company had relied largely upon the statements in the application in determining whether to issue the policy, and had acted upon the false statements to its injury. The plaintiffs relied upon the "incontestable clause" in the policy, which read as follows: "If the

age has not been understated and death shall occur later than three years from the date hereof, the liability of the company shall not be disputed on account of any statement in the application, except in case of actual fraud." It appeared that the death of the insured occurred more than three years after the policy was issued, and that the premiums had been paid. The evidence failed to show any knowledge on the part of the officers and agents of the company, or any notice to them, when the policy was issued, that the statements in the application were not true. The jury returned a verdict against the defendant for the full amount of the policy, and the defendant moved for a new trial. The motion was overruled by the court, and the movant excepted.

1, 2. The first question with which we are concerned is the meaning of the so-called incontestable clause of the policy. There was no contention that the age of the insured had been understated, or that his death had not occurred more than three years after the policy was issued. This being true, we think the effect of this clause was to limit the company, in denying liability on the ground of misstatement in the application, to such statements as were made with actual fraud. Where the fraud was constructive only, this clause barred the company's right to set it up. That the exception, "in case of actual fraud," applies to fraud in making statements in the application, seems clear when we consider that it is with these statements that the entire clause deals. Indeed, this is practically conceded in the briefs of counsel, and the argument is devoted to the question of proof of actual fraud. While a clause to the effect that an insurance policy shall from its date be absolutely incontestable is held to be an effort to condone fraud and against public policy, such a clause as is contained in the present policy is held good. A somewhat similar clause, making a policy incontestable after the lapse of three years, was held to be valid, as providing for a period of limitations or repose, in *Massachusetts B. L. Asso.* v. *Robinson*, 104 *Ga.* 256, 42 L. R. A. 261. In the absence of any such clause, any misstatement in the application, whereby the nature or character or extent of the risk is changed, will, if the policy makes that the basis of the contract of assurance, avoid the policy, whether such misstatement is or is not fraudulently made. *So. Life Ins. Co.* v. *Wilkinson*, 53 *Ga.* 535. The clause in the policy dealt with in the *Robinson* case precluded the

company from setting up misrepresentations in the application, whether made fraudulently or not. In the policy now under consideration, the clause extends only to constructive fraud, and excepts from its operation all cases in which the fraud is actual. "Fraud may be actual or constructive. Actual fraud consists in any kind of artifice by which another is deceived. Constructive fraud consists in any act of omission or commission, contrary to legal or equitable duty, trust or confidence justly reposed, which is contrary to good conscience and operates to the injury of another. The former implies moral guilt; the latter may be consistent with innocence." Civil Code, §4025. Constructive or presumptive fraud could not be relied upon as a defense by the defendant in the present case, and it contended that the insured had procured the policy of, insurance by means of actual fraud. The motion for new trial is based principally upon complaints of the charge of the court in regard to what is necessary to establish actual fraud. The court instructed the jury: " When a false statement is made as to a material fact, which is known to be false by the party making it, the presumption is that it was made to deceive the other party. That would be the presumption, gentlemen, in the absence of anything to the contrary." The jury were also instructed to find for the plaintiffs if the insured made the statements in good faith, without fraudulent intent, — that is, an intent to deceive the company and to procure it to issue, on the false statements, the policy of insurance.

Under the facts of the case, these instructions were erroneous. We are also of opinion that the evidence demanded a verdict for the defendant, except for a small sum which it tendered as a repayment of the premiums received by it on the policy. The evidence showed without contradiction that some of the most material statements in the application were false, were at the time known by the insured to be false, were not known to be false by the company or its agents, who were without notice of their falsity, were made in order to procure the insurance, and were acted upon by the company and relied upon by it in issuing the policy. The misrepresentations were also shown to relate to the physical and mental condition of the applicant for insurance, and to be, therefore, very material to the company's decision as to whether the policy applied for should be issued. Indeed, they were made warranties and part of the consideration for the contract of insurance. The

plaintiffs relied solely upon proof that the applicant had been a man of good character and not the kind of man to enter into a scheme to defraud an insurance company. This evidence of the plaintiffs was admitted, so far as appears, without objection. Under the charge of the court, the jury was authorized to find for the plaintiffs if they believed that the insured did not intend to deceive and defraud the company, although he may have wilfully made false representations as to material matters in order to procure the policy. This we think is not the law. While an intent to mislead or deceive is one of the essential elements of fraud, an intent to defraud and prejudice the other party is not so. (One who knowingly and wilfully makes false representations as to material facts, with intention thereby to induce the other to enter into a contract with him, and who does so induce the other to enter into the contract to his injury, is guilty of actual fraud, without regard to his intent as to injury to the other party.) There must be an immoral element in order to make a case of fraud, but this essential is supplied by knowledge of the falsity of the statements of fact made and the intent by such statements to deceive the other party into changing his status with reference to his rights. "An intention to deceive being a necessary element or ingredient of fraud, a false representation does not amount to a fraud in law unless it be made with a fraudulent intent. There is a fraudulent intent if a man, either with the view of benefiting himself or misleading another into a course of action which may be injurious to him, makes a representation which he knows to be false. . . The legal definition of fraud does not, however, include necessarily any degree of moral turpitude. There is fraud in law, if a man makes a representation which he knows to be false, . . with the view to induce another to act on the faith, who does so accordingly, and by so doing sustains damage, although he may have had no dishonest purpose in making the representation. If a man knowingly and wilfully makes a false representation whereby another is misled to his prejudice, it is immaterial that there may have been no intention on his part to benefit himself or to injure the person to whom the representation was made. If a man says what is false within his knowledge, . . and makes the representation with the view to induce another to act upon it, who does so accordingly to his prejudice, the law imputes to him a fraudulent intent, although he may not have been in fact insti-

gated by a morally bad motive.   An intention to deceive, or a fraudulent intent in the legal acceptation of the term, depends upon the knowledge or belief respecting the falsehood of the statement, and not upon the actual dishonesty of purpose in making the statement."   Kerr, Fraud (Am. ed.), 55.

Foster *v.* Charles, 6 Bing. 396, 19 E. C. L. 183, was a suit for deceit, wherein it was necessary to prove actual fraud to entitle the plaintiff to a recovery.   It was there held that where one is injured by false representations knowingly made by another; the latter is liable in damages as for actual fraud, without regard to the real motive which actuated him.   In that case Tindal, C. J., said: "The law will infer an improper motive if what the defendant says is false within his own knowledge and is the occasion of damage to the plaintiff."   Upon the retrial of the same case the jury found for the plaintiff, but added :   " We consider there was no actual fraud on the part of the defendant, and that he had no fraudulent intention, although what he has done constituted a fraud in the legal acceptation of the term."   The verdict for the plaintiff was upheld, Tindal, C. J., saying: "It is fraud in law if a party makes representations which he knows to be false and injury ensues, although the motive from which the representations proceeded may not have been bad : the person who makes such representations is responsible for the consequences."   7 Bing. 105, 20 E. C. L. 55.   In the same case Gasalee, J., said: "What the jury meant by actual fraud was a sordid regard to self-interest ; but the legal fraud, which is sufficient to sustain the action, was complete when the intention to mislead was followed by actual injury."   And Bosanquet, J., said : " If a person tells a falsehood the natural and obvious consequence of which, if acted on, is injury to another, that is fraud in law.   Coupling that with what the Chief Justice addressed to the jury, their verdict only means that the defendant did not propose to benefit himself, perhaps intended to benefit another; but that what he said, intending to benefit another, was false within his own knowledge, injurious to the party who received the communication, and, consequently, a fraud in the legal acceptation of the term."   In Polhill *v.* Walter, 3 B. & A. 114, 23 E. C. L. 38, the defendant accepted a bill as by procuration of the drawee, when in fact he had no such authority.   It was there held that he was chargeable in an action for deceit if he knew of his want of

authority and yet wrote the acceptance, thereby representing that he had authority, although he had no actual intention to defraud or injure the plaintiff, and believed that the drawee would ratify the unauthorized acceptance and the bill be paid when due. So, in an action for deceit by false representations as to the quality of wool sold, the Supreme Court of Illinois held that where it was established that the defendant took the wool to market, bound up in fleeces so that its quality could not be readily ascertained, and sold it to the plaintiff, representing that it was in good condition, when as matter of fact it had much extraneous matter in it in "ball form," and the plaintiff bought it relying upon defendant's representations, nothing more was required to entitle plaintiff to recover than that defendant knew the false representations were false. The judgment of the trial court was reversed for error in instructing the jury that the plaintiff could not recover "unless the representations were made fraudulently, with the design to injure the plaintiff." Case v. Ayers, 65 Ill. 142. Woods, J., in an exhaustive opinion in the case of Hanson v. Edgerly, 29 N. H. (9 Foster) 343, said : " If [material] facts are known to the vendor and there is an intentional concealment or suppression of them in making a contract, such concealment must be understood as intended for no other purpose than to deceive and mislead the vendee ; and where in such case the vendee has not equal means of information, he must be regarded as deceived and defrauded." See also Murray v. Mann, 17 L. J. (Exch.) 256 ; Claflin v. Ins. Co., 110 U. S. 96; Endsley v. Johns, 120 Ill. 469, 60 Am. R. 572 ; Clopton v. Cozart, 13 Smed. & M. 362 ; Bank of Atchison County v. Byers, 139 Mo. 627 ; Boyd's Executors v. Browne, 6 Pa. St. 310 ; Sellar v. Clelland, 2 Colo. 532.

Of course intention is generally a question for the determination of the jury, and the conduct of the parties as showing a fraudulent intent is generally for their consideration. But in the present case the facts were such that they could properly have made but one finding. The applicant for insurance made in his application a false statement with reference to a material matter of fact ; this statement was false within his knowledge ; it was made with a view to procuring the insurance, was made deliberately and with an agreement that it should be regarded as a warranty and as a part of the consideration of the contract of insurance ; the company had

no notice of its falsity, and acted upon it to its injury. Purposely misstating this material fact in order to induce the company relying upon it to enter into a contract which might prejudice its rights would be consistent with no other intention than one to deceive the company. The intention to deceive, coupled with the other facts in the case, conclusively showed fraud in the legal acceptation of the term. What the applicant thought or intended with reference to the consequences of his falsehood can not be material. He is presumed to have intended the natural consequence of what he purposely and knowingly did. We are therefore of opinion that the company completely made out its defense, and that the evidence of the plaintiffs was insufficient to overcome it. We are also of opinion that the court erred, under the evidence adduced, in leaving the jury free to find that there was no bad faith or intent to deceive on the part of the insured and that a verdict for the plaintiffs would be authorized.

3. The policy in this case was in part assigned, with the assent of the company, as collateral security for a debt, and it was argued that the company could not set up as against the assignee fraud in the application. This seems to be the rule in fire-insurance, where the original policy is not void, the consent to the assignment operating as a reissuance of the policy. 3 Joyce, Ins. § 2308. With regard to policies of life-insurance this is not the rule, and the assignee takes such a policy subject to such defenses (Ibid. § 2326) where it does not appear that the company, at the time of the assent to the assignment, had notice of the existence of such defenses.

*Judgment reversed. All the Justices concurring, except Lumpkin, P. J., absent.*