## 5399. EMPIRE LIFE INSURANCE CO. *v.* JONES.

1. Representations made in an application for insurance are considered as covenanted to be true by the applicant; and the policy will be voided by any variation which changes the nature, extent, or character of the risk. Any material representations of facts by the assured, to induce the acceptance of the risk, will void the policy, if untrue. Failure to state a material fact will not void a policy unless such failure be fraudulent; "but the wilful concealment of such a fact, which would enhance the risk, will void the policy." Civil Code (1910), §§ 2479, 2480 2481.

2. A material representation is one that would influence a prudent insurer in determining whether or not to accept the risk, or in fixing the amount of the premium in the event of such acceptance.

3. The truth and materiality of representations are generally questions of fact, for determination by the jury; but where all the testimony relating to a question of fact excludes every reasonable inference but one, the issue becomes an issue of law, for determination by the court.

DECIDED JUNE 22, 1914.

Action on insurance policy; from city court of Columbus—Judge Tigner.  December 6, 1913.

Roland Dixon Jones applied to the Empire Life Insurance Company, in May, 1912, for $5,000 of insurance on his life, and in his application directed that two policies be issued, one for $3,000 and one for $2,000.  Except as to amounts, the policies were identical. The application was approved, and the policies were issued June 8, 1912.  In the application the insured made the following agreement:  "It is hereby agreed that all the foregoing statements and answers, and also those I make to the company's medical examiner, are warranted to be full, complete, and true, and are offered to the company as a consideration for the contract, which shall not take effect until this application has been accepted by the company, at the home office, in Atlanta, Georgia, and the first premium shall have been paid to and accepted by the company, or an authorized agent, during the life and good health of the person herein proposed for a policy."

In the application and in the policy it is declared that the application and the policy "shall constitute the entire contract" between the parties; and the policy contains a clause providing that "all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall avoid the policy unless it is contained in the application, a copy of which is attached hereto."  A photographic copy of the original application, with the statements made by the assured in answer to questions of the medical examiner, was attached to each of the policies.  Among these questions and answers were the following:  "5. Have you any reason to believe yourself now to be not in perfect health?  [Answer] No."  "12. Do you now or have you ever used intoxicating liquors?  [Answer] No."  "13. If yes, state how often and how much?  [Answer] No."  "14. Did you ever become intoxicated?  [Answer] No."  "17. Have you ever had any of the following diseases or conditions?  Answer yes or no

to each question and give particulars under notes on the pink slip:
[Among other diseases and conditions named] Nervousness? [An-
swer] No." "Any diseases not mentioned? [Answer] No." "18.
Give name and address of each physician who has attended you
within last five years, and the disease for which each treated you?
[Answer] None." At the close of the questions propounded by the
medical examiner and the answers of the applicant, the following
appears: "I certify that the foregoing answers are correctly re-
corded by the Medical Examiner. [Signed] Roland Dixon Jones."

Jones died in December, 1912, and proofs of his death were
submitted to the insurance company, and demand was made for
payment of the policies. The demand was refused, and suit was
brought on the policies. The defendant denied liability, because
of alleged material representations made by the assured in the ap-
plication, so far varying from the truth as to change the nature,
extent, and character of the risk; because of alleged fraudulent
failure to state a material fact; because of alleged wilful misrepre-
sentation made in reply to material inquiries; and because of
alleged wilful concealment of a material fact which enhanced the
risk. On the call of the case for trial the defendant entered a
solemn admission in judicio as to all the averments made in the
plaintiff's petition, except as to bad faith and the damages sought
therefor, and the claim for attorney fees, but reserved the right to
rebut the prima facie case so admitted. It appeared, from the
testimony of the examining physician, that he propounded to Jones
the questions printed in the application attached to the policy, and
reduced the answers to writing in the presence of Jones, and that
each question was answered as shown by the application; that the
examiner had no cause or occasion to believe that the answers were
untrue; and that the application was signed by Jones after all the
questions therein had been propounded, and the answers written by
the examiner in his presence. This physician testified that he had
no knowledge of the habits of the applicant, but made inquiries in
regard thereto in order to gain such information, and that after the
examination was completed he recommended Jones as a first-class
risk to the insurance company. He testified further, that he had
been practising medicine for a number of years, and had treated
a few cases of delirium tremens; that continued use of alcohol or a
sudden cessation from its continued use—the chronic use, as dis-

tinguished from a spree—causes delirium tremens; that alcoholism is a disease, "temporarily a mental disease," and that "a person who has used intoxicants chronically and for a long time, to the extent that he has delirium tremens, is not a first-class risk for insurance, and the chronic use of alcohol for a long-continued time increases the hazard or risk of an insurance company in accepting the risk upon the person;" that "the excessive and chronic use of alcohol, according to all authorities, lowers the systemic resistance to disease;" that "every organ, especially the brain, lungs, and stomach, and heart are weakened by the continued use of alcohol;" and "the continued use, to the extent that would produce delirium tremens, produces nervousness." The witness said further that he had never met Jones until the occasion when he made the examination for insurance at the home of Jones, one evening by lamp-light, and that there was then no apparent defect in him, but he was a hale, healthy-looking man, and the witness detected nothing defective about his condition, and found no albumin in his urine, according to the nitric-acid test; that if Jones, in making his statements to the witness, had said that within two, three, four, or five years he suffered from delirium tremens brought about by the chronic use of intoxicants, the witness would not have passed him as a first-class insurable risk.

Dr. Williams testified that he attended the deceased in his last illness, together with Dr. McDuffie, who was once called in consultation, and that the deceased was ill about two weeks before his death; that according to his diagnosis the use of intoxicants had something to do with the last illness, that this was his diagnosis when he saw Jones,—"that he was suffering from the use of intoxicants—from alcohol;" that alcohol has a deleterious effect upon the human system, and makes those who use it more subject to and less able to resist disease; that in the opinion of the witness it frequently produces Bright's disease, and liver, brain, and nervous troubles; that delirium tremens is a disease of the nerves of the brain, and if a man has drunk chronically to the extent that delirium tremens resulted, he would be more subject to different diseases; and that alcoholism is a disease, and a person who has suffered delirium tremens from its use would be liable to continue such use in the future; that in 1910 the witness attended Jones once during the absence of his then regular physician, Dr. McDuffie,

and diagnosed his case at that time as delirium tremens, but the witness was unable to say that he died from delirium tremens in 1912, as the deceased had a cold, and symptoms of pleurisy and of pneumonia, with traces of pellagra. Dr. McDuffie testified that he visited the deceased in May, 1910, and found him suffering from delirium tremens, produced by excessive drinking of some alcoholic intoxicant; that he was suffering with a pronounced case, and was disturbed by hallucinations—fancied that people were troubling him, and saw snakes and things that had no existence; that the witness treated him four days, and during this time the patient had lucid intervals when his attention could be engaged and he would answer questions intelligently; that the witness talked with him when he was himself, after having treated him, and he told the witness that whisky was the cause of his condition, and that he had been drinking hard for a good while; that with this statement made by Jones, and his own diagnosis, there was no question in the mind of the witness as to the disease from which Jones then suffered; that long-continued drinking produces delirium tremens —the chronic, continued use of alcohol; that such drinking lowers the vitality, and shortens life as a rule, hardens the blood-vessels, and lessens resistance to disease, and many times brings on a form of Bright's disease; that if a man drank whisky chronically to the extent that it caused delirium tremens, he would never in the opinion of witness be the man he was before, or again a physically normal man; that the witness saw Jones during his last illness, in consultation with Dr. Williams, but Jones was not in a condition to answer any questions himself, and no definite information could be obtained from the family; that the witness was unable to say what alcohol had to do with his last illness, but felt that his condition was partly due to drinking. This witness signed the death proofs with Dr. Williams, and, in response to a question whether the deceased habitually used alcohol that influenced his last illness or death, stated that he was not sure,—that in fact he did not positively know, and was in doubt; that he felt alcoholism had something to do with the death, from what he heard during the illness of the deceased, from members of the family, of his use of alcohol.

Two medical experts, Doctors Wooldridge and Anderson, were introduced in behalf of the plaintiff. The former testified that delirium tremens was a condition which might be produced by

other things besides alcoholism, and that a patient suffering from the excessive use of alcohol, who responded perfectly to treatment and recovered, could, by abstaining absolutely from alcohol thereafter, be a hearty and well man—depending on the extent to which he had taken alcohol; that he would consider as material, in an examination for insurance, information that an applicant had been treated for delirium tremens within two years prior to his examination; that it would affect the risk, though, if the patient were a young man, strong and vigorous, who had delirium tremens in a mild form from excessive drinking, and had responded to about four days of treatment and was to all appearances hale and hearty, and two years thereafter stood a perfect physical examination, which included a test of his urine, and that the urine appeared to be normal, he would consider him an insurable risk, as excessive and habitual drinking would probably reveal itself in the urine test. The witness testified further that a man thirty-nine years of age can not endure as much as a young man, and if such a man had suffered from delirium tremens within two years prior to his application for insurance, from long-continued and chronic drinking, the witness would consider the risk affected thereby. The other expert witness for the plaintiff testified practically to the same effect, but added that he did not consider that a man thirty-seven years of age, who had been a chronic, long-continued drinker until he suffered from delirium tremens, would ever again be a normal man; and in his opinion the risk on the life of such a man for insurance would be increased. One Wardlaw testified that he had known the deceased intimately for fifteen years or more; that he had often seen the deceased take one drink a day, and had frequently taken a drink with him; he could not say that the deceased took more than a drink a day, but during the entire fifteen years before his death, he was not a teetotaler, but was a man who would take a social drink, though the witness never saw him in a condition of intoxication. The policies of insurance were introduced, together with the photographic copy of the application therefor attached to each, and proof was made as to what would be a proper fee for the prosecution of the suit against the defendant. There was evidence from some witnesses as to reports of the drinking habits of the deceased, and much evidence from others that they knew him in a business way and were unaware of the fact that he

drank. The jury returned a verdict in favor of the plaintiff for $5,000, for $350 damages, and $300 attorney's fees. The defendant made a motion for new trial, which was overruled, and the case was brought here for review.

*Battle & Hollis, Little, Powell, Hooper & Goldstein,* for plaintiff in error. *John H. Lewis, Love & Fort,* contra.

WADE, J. (After stating the foregoing facts.) The law of this State governing applications for insurance is embodied in sections 2479, 2480, and 2481 of the Civil Code of 1910, and nothing we might say could render more plain the clear, simple, and comprehensive language of these sections. Section 2479 provides that "Every application for insurance must be made in the utmost good faith, and the representations contained in such application are considered as covenanted to be true by the applicant. Any variation by which the nature, or extent, or character of the risk is changed will void the policy." Section 2480 declares that "Any verbal or written representations of facts by the assured to induce the acceptance of the risk, if material, must be true, or the policy is void. If, however, the party has no knowledge, but states on the representations of others, bona fide, and so informs the insurer, the falsity of the information does not void the policy." Section 2481 declares that "A failure to state a material fact, if not done fraudulently, does not void; but the willful concealment of such a fact, which would enhance the risk, will void the policy."

Under the general grounds of the motion for a new trial, the question to be considered is whether the evidence warranted the verdict; and if, to the contrary, it appears, from a consideration of the evidence, that a verdict for the defendant was demanded, no discussion of the special grounds of the motion will be needed. In determining this question, what is a material misrepresentation is all important. It appears from the application that Jones represented, in order to obtain the insurance, that he had no reason to believe himself to be at the time in other than perfect health, that he had never used intoxicating liquors in any quantity, had never become intoxicated, and had never suffered from nervousness, and that he had never consulted any physician within five years next preceding the date of his application. It further appeared, from the undisputed testimony of Doctors Williams and McDuffie, that

in 1910, some two years prior to the date of his application for insurance, Jones suffered from delirium tremens for a period of about four days, and it further appeared that on his recovery or partial recovery therefrom he informed Dr. McDuffie that his condition had been brought about by hard drinking; which merely expressed the conclusion that the physician had independently reached from his own diagnosis, and agreed with a like conclusion which Dr. Williams had arrived at from seeing the patient once, during this illness, in the absence of Dr. McDuffie. Wardlaw, the boon companion and personal friend of the deceased, asserted that the deceased had been a drinking man during a period of fifteen years immediately prior to his death. So it appeared that, long before the application for insurance was made, the deceased had fixed and established habits on this line, notwithstanding his assertion in the application that he did not drink at all. Not only did the three expert witnesses who testified in behalf of the defendant assert that delirium tremens, brought about from alcohol, invariably results from long-continued and chronic indulgence in excess, or from the sudden cessation from such indulgence, but the two expert witnesses for the plaintiff practically agreed in effect to this assertion, and all five physicians who were sworn (witnesses for plaintiff and defendant) stated unequivocally that the use of alcohol had an injurious effect on the human system, and rendered habitual users thereof more susceptible to disease or less able to resist disease; and all agreed further that the fact that a man of from thirty-seven to thirty-nine years of age had suffered from delirium tremens, brought on by excessive and long-continued indulgence in alcoholic stimulants, would greatly increase the risk in insuring him. There was no evidence to the contrary, and no evidence disputing the facts that the deceased was, for many years at least, a habitual drinker, and that, some two years before the application for insurance was made, he suffered from a severe attack of delirium tremens brought about from indulgence in intoxicants, which in his application for the insurance, he denied he had ever used in any quantity or at any time. Of course, "used" means more than an occasional indulgence, and refers to customary and habitual use; but under no view can it be said that one who suffered from delirium tremens as a result of long-continued and excessive consumption of alcohol, two years before a certain date, had never

"used" intoxicating liquors; and certainly the record discloses the falsity of the representation that the applicant for insurance had never been intoxicated.

It will be noted also that the assured stated in his application that no physician had attended or treated him within a period of five years prior to the date of the application, and that during that period he had suffered from no disease. See question 18 in the statement of facts. This representation was disputed by the testimony of Dr. Williams and Dr. McDuffie, and that testimony is unquestioned. It will be readily apprehended that if the applicant had truthfully stated that Dr. McDuffie treated him two years before for delirium tremens, this would at least have put the insurance company on inquiry, and would have enabled it to ascertain what that inquiry would have revealed, and, if the company nevertheless issued a contract of insurance after a full ascertainment of the facts, would have estopped the company from thereafter complaining on this account. It has been often held that "in determining what constitutes attendance by or consultation of a physician, consultation or attendance for slight temporary ailments need not be considered" (3 Cooley's Briefs on the Law of Insurance, 2163) ; but under all the expert testimony in this case, it would be impossible to classify delirium tremens as a "slight temporary ailment," since it is a matter of common knowledge that its consequences are often fatal, and the testimony referred to discloses that often its effects are lasting and serious; then, too, during the period of the actual delirium the entire nervous system must be shaken to its very foundation, since the testimony of the physicians who attended the assured in 1910 not only shows this to be the general effect upon one so stricken, but explicitly declares that Jones was unconscious during a large part of the time, and was delirious, with a hallucination that some persons not present were troubling him, and that he saw snakes and other things which had no actual existence. Jones denied, in his application, that he had ever suffered from nervousness.

It is now generally well settled that a material representation is one that would influence a prudent insurer in determining whether or not to accept the risk, or in fixing the amount of the premium in the event of such acceptance; and, as observed in Richards on Insurance Law (3d ed.), par. 99, p. 132, "the materiality of a

concealment or representation of fact depends, not on the ultimate influence of the fact upon the risk or its relation to the cause of loss, but on the immediate influence upon the party to whom the communication is made, or is due, in forming his judgment at the time of effecting the contract. The party thus sought to be influenced is generally the insurance company. Though the loss should arise from causes totally unconnected with the material fact concealed or misrepresented, the policy is void, because a true disclosure of the fact might have led the company to decline the insurance altogether, or to accept it only at a higher premium." See also the cases cited in support of this statement, and see 1 May on Insurance (4th ed.), par. 184, in which the author says: "The test of the materiality of a misrepresentation or concealment is that it influences the insurer in determining whether to accept the risk, and what premium to charge." The same doctrine is laid down in 3 Cooley's Briefs on the Law of Insurance, 1953, as follows: "In general, it may be said that the test, in determining whether quentions contained in an application for insurance are material, is whether the knowledge or ignorance of the facts sought to be elicited thereby would materially influence the action of the insurer." This statement is approved by this court in *Ætna Life Insurance Co.* v. *Conway*, 11 Ga. App. 562 (75 S. E. 915); and numerous well-considered opinions from courts of last resort sustain the authors referred to. It can not be assumed that the insurance company would have issued the policy to Jones if a truthful response had been made to the questions propounded as to his habits and his previous health, and as to the physicians who had attended him within a period of five years, and the disease for which he had been treated. In fact the examiner testified in so many words that he would not have recommended the deceased for insurance, had he known of the attack of delirium tremens from which the deceased had suffered two years before he was examined for this policy; nor could it be assumed that the questions set forth in the printed application supplied by the insurance company, to be propounded to the applicant by the examiner, were merely idle questions intended to reveal only unimportant facts: but it must be accepted as indisputably true that the questions relative to the health of the applicant and in regard to the use of intoxicating liquors, and the requirement therein that the appli-

cant give the name and address of each physician who had attended him within the last five years, and the disease for which each had treated him, were intended and expected to reveal facts or information which might possibly deter the company from issuing a policy of insurance to the applicant, or lead to such inquiry touching past medical attendance and previous diseases as would result in a refusal to contract. This view is sustained by all the expert testimony from both the plaintiff and the defendant, and especially by the direct testimony of the examiner upon whose favorable report the policy was actually issued, and who asserted that he would not have recommended its issuance had truthful answers been given to these questions. It is evident that the company considered the facts sought to be elicited by these questions material; and we may safely infer that the misrepresentations and concealment on the part of the applicant induced or brought about the contract of insurance.

It may be urged that the materiality of the representations made by the assured were questions of fact and for determination by the jury, but it seems to be well established that, while the truth and materiality of representations are *generally* questions of fact, for determination by the jury, yet where all the testimony relating to a question of fact excludes every reasonable inference but one, the issue becomes an issue of law, for determination by the court. Richards on Insurance Law (3d ed.), par. 101, p. 133, and cases there cited. This is but another way of expressing the idea that where facts proved are undisputed, the court may apply to them the law of the case, and must at last determine whether this would support or prevent a verdict in behalf of one of the parties to the case on trial. We do not think it can be reasonably inferred that the failure of the insured to state his habits as to drink, or to answer truthfully the questions as to his past illness or the attendance of physicians, was due merely to a lapse of memory, and that there was no intention to deceive or fraudulently induce the insurance company to enter into a contract which it would not otherwise have made; since a man could not forget altogether a habit of at least fifteen years standing. Nor does it appear possible that an attack of delirium tremens could have passed out of his recollection entirely within the space of two years, and that, too, when his attention was especially directed, in the medical examination, to the

subject of intoxicants and his habits in relation thereto, and he was immediately thereafter required to give the name of all physicians who had treated him within five years, two of whom lived in the same city where he resided, and must, by association of ideas, have recalled to his mind, whenever he saw either of them, the serious attack of illness he had weathered by their assistance. Unavoidably, unless his mental processes were impaired at the time to a serious degree (and the evidence of his business associates goes to show the contrary), he must have recalled the illness referred to. It may be that the assured did not realize the importance of the concealment and misrepresentations he made; but if so, this would not change the result, since every application must be made in the utmost good faith, and all representations of fact, made to induce the acceptance of the risk, must be true, if material, or the policy is voided.

In *Supreme Conclave* v. *Wood,* 120 *Ga.* 328 (47 S. E. 940), the court declares that "Where an applicant for life-insurance covenants in his application that the statements made to the medical examiner are true, and these statements are made a part of the contract of insurance and form the basis of such contract, any variation in any of them, which is material, whereby the nature or extent or character of the risk is changed, will avoid the policy, whether the statement was made in good faith or wilfully or fraudulently." This ruling was cited by the Supreme Court of the United States, 231 U. S. 554, in the case of Ætna Life Insurance Company v. Moore, that court declaring that under the Georgia law as set out in *Supreme Conclave* v. *Wood,* supra, if a "representation be material and the variation from truth be such as to change the nature, extent, or character of the risk," it is immaterial whether the applicant acted in good faith or not. The five physicians examined as experts (three for the defendant and two for the plaintiff), and who furnished the only testimony on this line, all agreed (mirabile dictu) in the opinion that the habitual use of alcohol was injurious to the human system, and rendered one who habitually indulged in such use more subject to disease and less able to resist many diseases; that delirium tremens was produced by long-continued excessive drinking of alcoholic beverages or by sudden cessation from such drink, and that no man of an age approximating the age reached by the assured two years before he ap-

plied for the insurance who had an attack of delirium tremens brought about by alcoholism, would ever be the same man physically as before the attack, and that the fact that an individual had undergone such a physical disturbance would enhance the risk of insurance on his life. It is well understood that the habitual use of alcohol lowers vitality and lessens the power of the body to resist the onslaughts of disease, and it is now a matter of almost universally common knowledge, of which the courts may take cognizance, that one who uses alcohol in any form and has done so for any considerable period of time is especially susceptible to pneumonia; and in this case it will be recalled that the physician who waited at the bedside of deceased during his last illness diagnosed his trouble in part as pneumonia, and said that he felt sure that alcoholism had brought about the condition of the patient. There is no evidence to indicate that either the agent who procured the application for insurance, or the medical examiner who propounded to the applicant the questions touching his physical condition, had any knowledge whatever of the untruthfulness of the representations made by him as to his habits, or knew anything not disclosed to the insurance company, which might have the effect of working an estoppel against the company, as in the case of *German American Mutual Life Association* v. *Farley,* 102 *Ga.* 720 (29 S. E. 615). The undisputed testimony showed that misrepresentations were made by the assured in his application for the policy, that there was a concealment of facts which must have been wilful, and that the misrepresentations made were material and led to the issuance of the policy, and that the facts wilfully concealed were also material, inasmuch as they would have assuredly led to an investigation which would have prevented the making of the contract of insurance.

As we understand the rule, it is not true that a misrepresentation or wilful concealment of facts is only material where the facts untruthfully stated or wilfully concealed bring about or contribute to, or are connected with, the death of the insured; but to the contrary, a false representation or wilful concealment of a material fact which enhances the risk, or changes the extent or character thereof, is material, if the insurance company is thereby induced to enter into or make a contract which otherwise it would have

declined. *Ætna Life Insurance Co.* v. *Conway*, supra; *Northwestern Life Insurance Co.* v. *Montgomery*, 116 *Ga.* 799 (43 S. E. 79).

To sum up the whole matter, we might ask the following questions: Was the "utmost good faith on the part of the assured" exercised when he made his application? The undisputed facts deny it. Was a case of actual fraud made out by the evidence? Under the decision in *Northwestern Life Insurance Co.* v. *Montgomery*, supra, this was undoubtedly true, even though it be generously assumed that the assured may not have actually intended to prejudice the rights of the company. Was there wilful concealment of any material fact? The undisputed testimony establishes it. These inquiries being determined as above, under what theory could a verdict, founded on a contract rendered null and void by fraud, and by express statutory provisions, be permitted to stand; and that notwithstanding the established policy of our courts to resolve all doubtful questions, where possible, in behalf of the insured against the insurer? Under the facts appearing in this record, the evidence demanded a verdict in favor of the insurance company, and the court should have granted a new trial upon this ground alone; and hence it is unnecessary to make reference to the special assignments of error in the amendment to the motion for a new trial, or more particularly to that ground which presents for consideration certain newly discovered evidence.

*Judgment reversed. Roan, J., absent.*