27432. SOUTHERN LIFE INSURANCE COMPANY OF GEORGIA *v.* WHITE.

DECIDED JUNE 16, 1939. REHEARING DENIED JULY 22, 1939.

*Robert H. Jones, Erwin & Nix, Joseph D. Quillian,* for plaintiff in error.

*Robert L. Russell,* contra.

MACINTYRE, J. █ The controlling question in this case is whether or not the evidence authorized the verdict. On December 12, 1936, the plaintiff's husband, William W. White (hereafter referred to as the insured), applied to the defendant, Southern Life Insurance Company of Georgia (hereafter referred to as the insurer), for a policy of life insurance, naming as the beneficiary his wife, the plaintiff, Eulalia R. White, who was also an agent of the defendant company. Mrs. White, the plaintiff, testified on cross-examination: "Mr. White's condition of health on the day

this policy was taken, on December 12th, was as good as it had ever been. I didn't know about any of those spells of vomiting he had been having with his stomach. He vomited all his life just a little bit, not much, and it was nothing more than usual then. As to how often these vomiting spells would occur, it wasn't what you call spells. It was just some vomiting. As to whether he had had vomiting spells, most anybody does when they eat too much."

Dr. H. W. Birdsong, a witness for the insurer, testified that on March 4, 1937, the insured came to him as a patient and gave the following history which we quote verbatim: "He said he was 49 years old, his chief complaint was pain about the lower pyloric end of the stomach with indigestion which he said began sometime in October, 1936; his temperature at that time was 100, pulse 90, blood pressure 130/80, high pressure 130 and low 80; his hemoglobin was 70, which showed he was somewhat anemic; his past history, he said he had been a heavy eater and drinker and he talked about going out and eating a heavy meal and then going out and emptying his stomach soon after. He said this had been going on several years, and said before this condition that he come to the doctor from the beginning in October, 1936; he complained at the time of having quite a bit of gas on his stomach, and said he had lost thirty-eight pounds in the past six months, and that he had lost three pounds in the past ten days. At the time he was to see me he weighed 159 pounds; he was then on a liquid diet and said he had not vomited while on the liquid diet but was nauseated every morning, or he would belch sour water, the contents of water or gastric matter. At this time he was very weak, he said his appetite was good, there was no pain on [or] pressure, but that there was a mass about the size of a small orange in his side. Patient said he noticed this some two weeks before coming to my office. So we x-rayed the patient and the x-ray was later carried away; some one of the family come down and got it and carried it to Atlanta, and I haven't seen it since but it was No. 483, and it showed an obstruction, and from the x-ray I diagnosed malignancy." Dr. Birdsong further testified that the diagnosis was malignancy, and by malignancy he meant cancer of the stomach. The doctor further testified that the average length of time that it took a cancer to develop was eighteen months, depending upon its location and how soon it caused an obstruction; that patient's symptoms went back to October, 1936.

On the same date the application for insurance was made, December 12, 1936, the insured submitted to a physical examination by Dr. W. L. Mathews, the duly-appointed and authorized medical examiner of the company, who was well acquainted with the insured and who recommended to the company, based upon such examination, that a policy of insurance issue in accordance with the application. Thereafter, the company requested Dr. Mathews to secure a specimen of urine and forward the same to the company for examination and urinalysis, which was done, and the specimen was received and examined by the company on December 29, 1936. The findings disclosed by this examination, and reported to the medical director and the executive officers of the company, showed a condition existing in the insured upon which Dr. Lake, in whose office the analysis was made, testified that he could not recommend that a policy of insurance issue. On January 6, 1937, the company wrote Dr. Mathews and requested that it be furnished a second specimen of the insured's urine. During this period in January, 1937, in what respects Dr. Mathews was acting on behalf of the company and in what respects he was acting on behalf of the insured were questions for the jury. On January 29, 1937, the insured requested from the agent of the company a withdrawal of the application, which request was transmitted to the company by the agent, his reason for such request being, in the language of his wife, "they had been so long in issuing the policy." During the month of January, the insured had gone to Dr. Mathews and complained that he was suffering from indigestion and that when he overate he had vomiting spells.

Thereafter, on February 9, 1937, the company wrote its agent, acknowledging receipt of this request that the application be withdrawn, as follows: "We duly received your request that this application be filed as withdrawn. Before taking this action we would like to ask why Mr. White is not willing to complete the transaction, particularly due to the [fact] the company has already incurred the expense of medical examination fee, a laboratory report fee, and other incidental items. We requested Dr. W. L. Mathews on January 6th to furnish us a second specimen, explaining that while the laboratory report on the first sample was not distinctly unfavorable, it was our feeling that we should have the benefit of another urinalysis before passing on the case. As this is the *only require-*

*ment to be met,* we hope Mr. White will reconsider his decision to withdraw the application and visit Dr. Mathew's office so that the necessary specimen may be forwarded." (Italics ours.) After communicating this information to the insured, the company was advised by its agent as follows: "In replying to your letter of February 9th, relative to the above applicant, Mr. White advises me that he is willing to submit to Dr. Mathews the second specimen as per your letter of the 9th, with this understanding, that if any disturbance should show up on such specimen which would not warrant granting insurance that his previous request still remain in effect and the medical expense will be paid by Mr. White." Thereafter, on February 17, 1937, the company, from its home office, wrote its agent, Mrs. White, as follows: "We assure you that Mr. White's position would be no different following the submission of the required second specimen in connection with his pending application than it is at present, and that it will be our aim to handle the case in a manner that would not cause him any embarrassment or inconvenience. We are hoping that he will now permit Dr. Mathews to send us the required additional sample promptly." The contents of these letters were disclosed to the insured. On February 23, 1937, the company received the second specimen and upon examination and urinalysis, the report of its doctors, on February 25, to the officers of the company, revealed an insurable condition so far as urine was concerned. The policy was issued under date of March 3, 1937, and mailed to Mrs. E. R. White, the agent of the company and wife of the insured, and the evidence authorized a finding that the policy was delivered to the insured on March 5, 1937, before the completion of Dr. Birdsong's examination; that at the time of the receipt of the policy by the insured he had received no report relative to Dr. Birdsong's examination; and that the insured signed a receipt which was in part as follows: "I certify that there has been no change in my occupation, residence, or family history, that I have suffered no illness, or injury."

During the period of January and February the insured insisted to Dr. Mathews that he was not a sick man. It appears from the evidence that the insured did not go to bed but kept on working until about May 7 (the policy was delivered on March 5); that he was operated on the latter part of May, 1937, and died June 3,

1937. Dr. Mathews, witness for the defendant insurer, and the doctor who examined the insured for insurance on December 12, 1936, testified in part that along in January, 1937, the insured "would stop me on the street on the way up to my office and want some medicine for indigestion and I give it to him. At that time, I did not make any examination of him. I did make a specific examination of Mr. White on February 15th. That was made at my instance. I asked him to come up to my office. I was acting as his physician. When he came up there on February 15th, I did make an examination then. I couldn't find anything particular, only him complaining of vomiting, when he would eat heavy meals he vomited his food. He complained of pain until his stomach was empty. He did not tell me whether or not he was prevented from sleeping by pain. I next examined him on the 18th, 22nd, and 28th of February. Yes, I examined him on the 18th of February. *I found nothing particular on any examination* [italics ours]. Yes, he was still complaining of pain. He was losing weight. We would weigh him. . . [He lost about eleven pounds between December 12, the first time he was examined, and February 18.] Yes, he was losing enough weight to indicate he was a sick man. As to whether Mr. White knew he was a sick man, from what he said to me he would always fight against he was a sick man. . . I did examine him . . on the day before I carried him to Athens. . . I taken him to Athens March 4th. . . As to whether I found anything unusual, yes. I found a tenderness *and a small mass* [lump]. *The mass was in the abdomen on the right side. I couldn't tell where it was from feeling* [italics ours]. I could tell it was there. Yes, he did tell me he had felt it. Yes, he was complaining of pain. On the next day, on March 4th, I went with him to Athens. I told him I would take him down there to have an x-ray made, to see if we could find what was his trouble. As to whether he told me he had some trouble, Mr. White didn't say much about it. I was more insistent than he was. Yes, he knew he had a growth there. . . When I come back I told her [Mrs. White] I found a tumor. . . They are either malignant or not malignant. I don't consider them serious if they are not malignant. . . As to whether I mean to testify the loss of eleven pounds in over three months in every case proves illness, it's not excessive. I was the one that was insisting on

them going to Athens. *He said there wasn't anything wrong with him* [italics ours]. . . Yes, he was at work in December when I made this examination, and he was at work in March, both before and after he went to Athens. . . He didn't lose any time until [at least a month after the policy was delivered] ; I put him to bed, it was along the first of April I think. . . In all those examinations, beginning with December 12th and going on to February 15th, and February 18th and February 22nd and February 28th, as to whether I couldn't find anything wrong with him, I couldn't put my hand on it. Yes, it was over a month after the policy had been delivered in May at the time of the operation that I really found out what was wrong with him. As to whether that's the first time anybody really knew what was wrong with him, well, there was several men thought they did and there was several on the other side. Yes, there was a difference of medical opinion."

Dr. Lake, one of the company's doctors in whose office the analysis of the insured's urine was made by a Dr. Ayer, transmitted to the company his first report of the urine on December 30, 1936, and the second on February 25, 1937. One of the defendant's doctors, relative to the said report, testified that the "albumin in the urine usually shows a cancerous condition;" that the finding in the urine of the insured of four-plus indican showed a severe toxic condition, and the granulated casts showed either a body defect or a diseased kidney, and that the acid shown would put a doctor on notice that "there is something wrong with that man;" and that a man whose urine test was like the first test of the insured was not "in an insurable condition." The company, through its general officers, knew of the contents of the report of the health test by its doctors, and the jury were authorized to find that the insured did not know of the contents of the reports of the company's various doctors other than that he knew, generally, they were withholding the policy for further test of his urine.

According to Black's Law Dictionary (3d ed.), 918, illness, in insurance law, is "a disease or ailment of such a character as to affect the general soundness and healthfulness of the system· seriously, and not a mere temporary indisposition which does not tend to undermine or weaken the constitution of the insured." See authorities there cited, and also *Federal Life Insurance Co.* v. *Summergill*, 45 *Ga. App.* 829, 830 (166 S. E. 54) ; *Southern States*

*Life Ins. Co.* v. *Morris,* 24 *Ga. App.* 746 (102 S. E. 179) ; *Mutual Benefit Health & Accident Asso.* v. *Bell,* 49 *Ga. App.* 640, 654 (176 S. E. 124).

Just what Dr. Mathews, in his dual capacity as family physician for the insured and examining physician for the insurer, should have done relative to notifying the company of the illness of the insured, if any, during these few months, from December 12, 1936, until March 5, 1937, the date the policy was delivered, and even subsequently to the delivery, up to the time the deceased died, and what he should have told the deceased before and after he (the insured) accepted the policy, after he had once requested its withdrawal, were questions for the jury. On the whole testimony, whether Dr. Mathews perpetrated a fraud either on the deceased or on the company, or whether he perpetrated no fraud at all, were likewise jury questions. Relative to whether the deceased perpetrated a fraud on the company, the jury were authorized to find that the only suggestion to the insured, before March 3, 1937, the day the insured felt a lump in his stomach, that he was in ill health was what he (the insured) called indigestion, accompanied by vomiting when he overate very indiscreetly, and that he had had these spells ever since he had been married many years before, and also the other suggestion made by the company's doctor relative to the insured's urine, evidenced by the test of the company's doctor of the urine, were symptoms, the importance of which, if the insured knew, he certainly did not know more than the company's doctors themselves and by the delivery of the policy after knowledge of such symptoms of disorder, the company waived further examinations as to these disorders.

Relative to the indigestion accompanied by vomiting when the insured overate indiscreetly, which his wife testified had been going on for years, the jury probably took into consideration the fact that the insured selected and consulted Dr. Mathews, the very doctor the insurance company selected to examine the insured, and the further fact that, on account of the delay, the insured had requested the withdrawal of the application during the month of January, and that the insurance company requested him not to do so, and that all this time he was regularly attending to his business, never going to bed, and insisting to the doctor that there was nothing much the matter with him. So up until March 5, the time

the policy was issued, which was the day on which the deceased discovered the lump in his side, the jury were authorized to find that there was no fraud on the part of the insured.

Now, would the fact that on discovery of the lump in his side he went to his doctor (the very doctor whom the company had selected to examine him for insurance), and disclosed the fact that there was such a lump, and the doctor himself said he could not locate exactly where and what the lump was, and suggested that they go to Athens, an adjoining town, and have an x-ray and general examination, which they did on March 4 and 5, void the policy? We think not, for it does not appear that Dr. Mathews or the insured considered it more than a mere temporary indisposition until after Dr. Birdsong had made a report of his examination, and Dr. Birdsong's examination was not completed until the fifth, and on the morning of the fifth, before the insured returned to Athens from his home town of Winder for the completion of his examination, the insurance policy, having arrived in his home town, was delivered to him and the first quarterly premium was paid, and at the time of the receipt of the policy by the insured he had received no report relative to Dr. Birdsong's examination. Nor does the evidence demand a finding that he suffered from a disorder the existence of which was not ascertained by the examining physician of the insurance company. Dr. Mathews testified that he was the one who insisted that the insured go to Athens, and that the insured had said "there wasn't anything wrong with him. . . I didn't make any report of the examination at Athens the first day I went over there, for it wasn't completed. He went back on March 5th. I didn't. I didn't go back on March 5th, but he went back and completed the examination. No, there couldn't be a definite report on March 4th."

The Supreme Court of South Carolina in the case of Gamble v. Metropolitan Life Insurance Co., 95 S. C. 196, 199 (78 S. E. 875), has said: "We can not say that there was no evidence. An examination of the deceased by a physician chosen by the insurer is some evidence of one of two things: either that the disease did not exist, or that its existence was known to and waived by the insurer." Chief Justice Gary, in his special concurrence in that case, said: "One of the provisions in the policy is that 'all statements made by the insured shall, in the absence of fraud, be deemed

representations and not warranties.' Therefore, even if the statements contained in the application were not true, this fact alone, was not sufficient to defeat the plaintiff's right of recovery. The burden of proof rested upon the defendant to prove, as alleged by it, that the policy of insurance was obtained by fraud, misrepresentations and deceit, which unquestionably would render it null and void. The testimony upon this question was conflicting, and the case was properly submitted to the jury."

Our own Court of Appeals has said: "We do not mean to say that if an applicant for insurance acts in the utmost good faith and fairly discloses to the company all of the information in his possession which would throw any light upon the condition of his health and the desirability of the risk, the policy would be void, even though it developed that he suffered from a disorder as to which he had no knowledge, and the existence of which was not ascertained by the examining physicians." *Ætna Life Insurance Co.* v. *Conway,* 11 *Ga. App.* 557, 561 (75 S. E. 915).

When the evidence presents a tangled web of uncertainty as to what is the real fact relative to a material issue in the case, under our law and legal procedure, we know of nothing to do about it except to let the jury untangle the facts, and if, in so untangling them, their findings are supported by any evidence, it is our prescribed duty to accept and leave undisturbed such findings of fact, and so we do in this case. The application was attached to and became a part of the insurance policy in this case. One of the provisions in the application was, "I hereby declare that the answers to all questions in part one and part two of this application, which, in the absence of fraud, shall be deemed representations and not warranties, are true and complete. I agree that said answers with the declaration, shall form the basis of any contract that may be issued on this application, my acceptance of which contract shall constitute acceptance of all the conditions and agreements contained therein."

"The courts of the United States and of several of the States have for several years been trying to get away from the earlier decisions in regard to warranties in insurance policies. All of the earlier decisions, so far as we are aware, hold the insured bound by the strict law of warranty, whether the statement warranted be material or not, holding that the parties had the right to agree

that a representation was material, though in fact it was not. Latterly some of the courts have strained to construe the statements of the insured as representations wherever they were not unequivocally made warranties." *Supreme Conclave Knights of Damon* v. *Wood*, 120 *Ga.* 328, 336 (47 S. E. 940). Doubtless great injustice and hardship were worked under the early decisions of the courts, and it was probably because of this that there were placed in the Code of 1863, what are now Code, §§ 56-820 and 56-821, and, finally, that there was passed the act of 1927, which is now codified, as § 56-908, as follows: "All persons applying for life insurance in a life insurance company writing life insurance in this State shall submit to such reasonable rules and regulations as may be prescribed by such insurance company; and after a policy shall be issued on the life of such person, the beneficiary of such policy shall be entitled to collect the amount of such policy under the terms of the contract when it shall mature, unless the applicant or beneficiary shall have been guilty of actual fraud or shall have made material misrepresentations in procuring such policy, which representations change the character and nature of the risk as contemplated in the policy so issued by the company. No statements, covenants, or representations contained in applications for insurance shall ever be held or construed to be warranties, but shall be held to be representations only." Therefore, if the statements contained in the application attached to the policy were not true, this fact alone was not sufficient to defeat the plaintiff's right of recovery. The policy in this case having been delivered, the burden of proof rested upon the defendant to prove that the insured was guilty of actual fraud, or had made material misrepresentations in procuring the policy, which representations changed the character and nature of the risk as contemplated in the policy.

The insured does not appear to have concealed anything from Dr. Mathews, irrespective of whether he thought Dr. Mathews the proper person to whom he should report any indispositions relative to his application for insurance. The evidence authorized a finding that at the time he reported his indisposition and vomiting to Dr. Mathews in January, 1937, he (Dr. Mathews) was still acting for the company relative to the insured's physical examination for the policy in question. The jury were further authorized to find that when the policy was tendered to him, he (the insured) had a

right to believe that it had been sent by the insurance company after the doctors of the company had thoroughly examined and considered his physical condition over a period of several months; that it was not demanded of him that he again seek to withdraw his application or otherwise delay the acceptance of the policy; that he, as applicant for the insurance, had acted in the utmost good faith and had fairly disclosed to the company, through its doctors, *all of the information in his possession* which would throw any light on the condition of his health and the desirability of his risk; and that, even though it developed that he suffered from a disorder as to which he had no knowledge and the existence of which was not ascertained by the examining physicians, the policy would not be void. *Ætna Life Insurance Co.* v. *Conway,* supra; *Mutual Benefit Health &c. Asso.* v. *Bell,* supra; *Atlantic & Birmingham R. Co.* v. *Douglas,* 119 *Ga.* 658, 661 (46 S. E. 867). The evidence authorized the verdict.

None of the special grounds of the motion for new trial contend that the charges of the court excepted to are incorrect principles of law, but contend that they were not supported by or adjusted to the evidence. After a careful consideration of the special grounds we are of the opinion that they are not meritorious.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*

ON MOTION FOR REHEARING.

MacINTYRE, J. The movant contends that "the court further overlooked the fact that even if it were proper to leave to the jury the question of good faith or fraud in the original application, yet under the undisputed facts fraud was demonstrated and proven beyond question as to the condition of the health of the insured at the time of the delivery of the policy, and as to the change in his physical condition between the time of the application and the delivery of the policy, and his actual knowledge at the time of the delivery of the policy that he was not in good health, and that it was error to leave this question for decision by the jury."

The evidence authorized the jury to find that Dr. Mathews was the examining physician on behalf of the insurance company; that he examined the insured on December 12, 1936, and thereupon recommended his acceptance, and that the insured was re-examined at various times over a period of about three months; that at one time the insured became exasperated at the delay in issuing him

a policy and requested a return of his application for insurance, and the insurance company asked him to withdraw this request, which he did; and that from time to time he reported to Dr. Mathews what he thought was a mere temporary indisposition, and finally the policy came and he accepted it, stating in the receipt: "I certify that there has been no change in my occupation, residence, or family history, that I have suffered no illness, or injury." The jury was further authorized to find, under the circumstances, that Dr. Mathews had examined him at least three or four times after the original examination, certainly on the 15th, 18th, 22nd, and 28th of February, 1937, and stated: "I found nothing particular on any [of these] examinations." The fact that on March 3,.1937, two days before the policy was delivered to him on March 5, 1937, the insured discovered a small mass or lump in his abdomen, which he immediately reported to Dr. Mathews, was not conclusive that the deceased knew that he had suffered from an illness such as would void the policy as is contemplated in insurance law (see Black's definition of illness in the opinion, supra), especially when it appears that the doctor himself, on examining the deceased, could not locate the mass or lump, except that it was somewhere in the abdomen, and, later on, its location was discovered only by x-ray by another doctor and its location and character were told to the insured only after he had accepted the policy.

Dr. Mathews, as examining physician for the insurance company, examined the insured on December 12, 1936, and from then until the time of the acceptance of the policy by the insured on March 5, 1937, the insured reported every indisposition to Dr. Mathews, and the testimony of Dr. Mathews does not demand a finding that he (the doctor) ever told the insured he was suffering from an illness or serious disease in contradistinction to a mere temporary indisposition, nor does the testimony disclose that Dr. Mathews ever notified the insurance company that the deceased was suffering from such illness before the issuance and delivery of the policy. A failure to so report by Dr. Mathews, whether acting for the insured or for the insurance company, might have been considered by the jury as a circumstance to show that Dr. Mathews, himself, did not consider the ailment or indisposition as serious until after Dr. Birdsong had x-rayed the deceased and had re-

ported his finding to Dr. Mathews, which was after the delivery of the policy. The fact that the insured concealed nothing relative to any physical indisposition, from Dr. Mathews, but reported to him all such matters, might also have been considered by the jury as a circumstance tending to show that the insured did not know that he was suffering from anything other than a mere temporary indisposition. Under the facts and circumstances of this case we think it was a question for the jury to determine whether the deceased knew, at the time of the delivery of the policy, that he was suffering from a disease or ailment which was of such character as to affect the general soundness and healthfulness of his system generally, and not a mere temporary indisposition which did not tend to undermine or weaken his constitution.

Moreover, was it not a jury question as to whether Dr. Mathews, the examining doctor, was the agent of the insurance company, even up until the time of the acceptance of the policy? The jury might have determined that the examination was not entirely completed immediately after Dr. Mathews recommended an acceptance of the deceased as a proper risk, or if completed, that it was reopened, for the insurance company thereafter was calling on the deceased for an additional specimen of urine to be delivered to Dr. Mathews, the physician they had designated to examine him. If he was not its agent for determining if and when the deceased was or was not a proper risk, when did he cease to be its agent? The only definite testimony in the record relative to this is that on February 17, 1937, the company was asking that Dr. Mathews, the doctor who examined the deceased, be given another specimen of the deceased's urine, and the company receiving a specimen on February 23, 1937. Dr. Mathews says he examined the deceased on February 15, 1937, at his (the doctor's) instance, and that he was acting as the deceased's physician. We think it was for the jury to reconcile this testimony, if they could; and, if they could not, to decide whether at this time Dr. Mathews was the agent of the insurance company, and if so, whether he or the insured, or both together, perpetrated a fraud on the company, or whether Dr. Mathews merely thought the insured had a temporary indisposition and not a serious illness, and for that reason did not think it necessary to inform either the insured or the insurer until after the x-ray had been made and Dr. Birdsong had completed his examina-

tion, a report of which was not made to the insured until after the acceptance of the policy. Therefore, if the insured gave Dr. Mathews all the information in his possession, and the symptoms did not disclose to Dr. Mathews a serious illness as contemplated in insurance law, the jury were certainly authorized to find that the insured also was unaware of such illness. We can only repeat that the evidence authorized a finding by the jury that the applicant for the insurance had acted in the utmost good faith, and had fairly disclosed to the company, through its doctor, *all of the information in his possession* which would throw any light on the condition of his health and the desirability of his risk; and that even though it developed that he suffered from a disorder, as to which he had no knowledge and the existence of which was not ascertained by the examining phyicians, the policy would not be void. We think the motion for rehearing should be denied on each and every ground thereof. *Rehearing denied. Broyles, C. J., and Guerry, J., concur.*