29775. COMMERCIAL CASUALTY INSURANCE COMPANY
*v.* JEFFERS.

54

[redacted]

DECIDED MARCH 10, 1943.

[redacted]

*Robert D. Tisinger*, for plaintiff in error.

*O. W. Roberts Jr., L. E. Moore, Don B. Howe*, contra.

MacINTYRE, J. This suit is based on the accident feature of a life-insurance policy. The application was attached to and became a part of the policy. This application stated that the company was not bound by any knowledge of or any statements made by or to any agent, unless written thereon. It contained the following question: "Have you been disabled by either accident or illness or received medical or surgical attention during the last five years?" To this the plaintiff answered "No."

■ The testimony on the question whether the disability sued for was an accident resulting from external and violent causes, which would come within the provisions of the policy, rather than from illness as defined in insurance law, was that of the plaintiff, as follows: "I became ill the night of the 28th of November, about 8 o'clock or 8:30. I had been in bed then about fifteen or twenty minutes. The symptoms were, it commenced stinging, kind of itching. I rubbed it a little; that was my scrotum, the right side. I first got out of bed after I began noticing it, about 2:30. I did make an examination of the bed, I found nothing. I never found any insect or spider, I never saw one at all. I don't know what it was. I never thought about it being no insect. I didn't call a doctor that night; it wasn't so serious that I did that. I went to see one next morning. Later on this became more or less of an abscess from the inside, and was lanced by Dr. Roberts. It did in about three weeks, something like that. As to whether or not anything bit me, I couldn't say of my own knowledge, there was just a spot there." Also the testimony of Dr. Roberts, who had been the plaintiff's family doctor for fifteen years, that he had treated the plaintiff for the ailment in question (whether it was an accident or an illness) at the plaintiffs' home on December, 2, 4, 6, 7,

and 14, 1940, and on January 3, 1941; and at the doctor's office on December 20 and 28, 1940, and on January 15 and 29, 1941; and that "the spell of December, 1940, and January, 1941, gave a history of an undetermined insect bite on the scrotum. "To me it appeared to be a spider bite. This developed into an abscess within the scrotum, which required an operation and drainage and dressings. He did not have any venereal disease. I did not see the insect. The wound had the appearance of a spider bite. The severe constitutional reactions and sequelæ corresponded to those from a poisonous spider."

Dr. Allen, a witness for the defendant, who had dressed the plaintiff's thumb on another occasion, stated: "The only other record I have of seeing him was November 30, 1940. It was for a skin infection of the scrotum. I examined that at the time I saw him. What he had was a skin irritation of the scrotum. He said he had been bitten, and I don't recall exactly how long before it was. I don't recall whether it was a few days or months. I couldn't determine whether that infection arose from a bite or other cause. One time was all I treated him. He did not give me any medical history on either of these occasions, as to any other trouble he had had. I have seen him some eight or nine times all told, [only one time for the injury sued for, while the other times were for dressing the thumb which Dr. Roberts had lanced]. That occurred since I have been practicing here. I think the treatment I gave him was some ointment to apply locally. That had the appearance of an infection or irritation that could have come from any other cause. It could have come from most any thing that would let the infection get within the layers of the skin."

Thus it seems to us that the jury were authorized to accept the opinion of the family physician, Dr. Roberts (who had been such for fifteen years and who was likely to know the general health of the plaintiff, and who had treated the spider bite in question ten times during a period of two months) that the ailment was the result of a spider bite, and not a skin disease or other ailment resulting from the plaintiff's general health. And if the jury were authorized so to find, they were authorized to find further that the plaintiff was suffering as a result of an accident as defined in the policy.

 In answer to the question whether the plaintiff had been

disabled by either accident or illness or had received medical or surgical attention during the last five years, the testimony in substance was as follows: "I am O. E. Roberts, physician and surgeon: Carrollton, Georgia, twenty-two years. I am acquainted with Mr. Homer Jeffers of Buchanan, Georgia. I have been his family physician for the past fifteen years. The first professional service I gave to Mr. Jeffers was during January, 1932, when I treated him through a light spell of fever. He was ill about two weeks. [This was more than five years before the issuance of the policy, and did not come within its provisions.] July 5, 1939, to December 1, 1939, he was on a diet for weight reduction, as a health precautionary measure. He lost about eighty pounds—down to the proper weight for his height and age. He had some indigestion during this time. It was not a spell of sickness. He was going about his business. Besides the above-mentioned professional treatments, I opened an abscessed finger for him September 7, 1939. These dates are from my records and memory. The first and only spell of sickness for which I treated him, other than office calls enumerated above, since January, 1932, fever spell, came during December 2, 1940, to January 29, 1941. The dates are as follows: Visits to him at his home, December 2, 4, 6, 7, 14; office visits, December 20, 28, 1940. Visits to him at home, January 3, 1941, and office visits January 15 and 29, 1941. The abscessed finger came from a match burn. The spell of December, 1940, and January, 1941, gave a history of an undetermined insect bite on the scrotum. To me it appeared to be a spider bite. This developed into an abscess within the scrotum which required an operation and drainage and dressings. He did not have any venereal disease. I did not see the insect. The wound had the appearance of a spider bite. The severe constitutional reaction and sequelæ corresponded to those of a bite from a poisonous spider. He has not had any paralysis of the right leg or anywhere else. As to the frontal headache pain, it was a temporary affair, like most people have at times. As a safe and precautionary measure I referred him to a nose and throat specialist. The specialist's report was negative as to any pathology or disease there. No other treatment was required, and the subjective symptom of pain soon disappeared. The gastric complaint has already been outlined in detail. A reducing diet causes digestive discomfort, often. The prescribed diet to reduce

excessive weight as a precautionary health measure has already been detailed above. Date: July 5th to December 1st, 1939. This brought about a satisfactory result. I am his family physician. During fifteen years as such he had two-weeks fever in 1932; a sore finger in 1939; an abscessed scrotum during December, 1940, and January 1941. Besides these, my observations have been directed towards keeping him in good health. All other occasions of my knowledge, where he consulted either myself or some other physician at my direction, have been precautionary health movements, calculated to prevent illness and to maintain health. I doubt if many people have enjoyed better health during life than Mr. Jeffers has. He has not been in bad health. Two-weeks fever in 1932 and the abscessed scrotum in 1940 constitute the amount of sickness he has had, to which any importance would be attached by any good physician. His other visits to physicians have been preventive visits. I think his health record is remarkable. His 1940 spell is the only one worth note since 1932."

On this issue the plaintiff testified: "As to how many doctors have I been to see for consultation and medical treatment within five years before I applied for this policy, Dr. Smith at Rome, an eye examination, glasses fitted. That was in five years before I signed this. I had a pain under the left eye, and had glasses fitted for that. Dr. Smith at Rome did that. I went back to him; it didn't relieve it; and he examined it again in September, 1939, I believe. I made three visits. I went back to him in November, and he tested my head and told me to go to a dentist. I probably had a bad tooth, so I went across the street to a dentist, and he x-rayed my tooth and found I had a wisdom tooth growing into the first jaw tooth, and I ought to have it extracted. I went to see Dr. Anderson at Bremen, and had the tooth removed. As to who else, in January I went to Atlanta to Dr. Equen, and had an x-ray of the head; and I went to Dr. Crawford in Atlanta. Both of these men are specialists, eye, ear, nose, and throat specialists. During that period Dr. Roberts had me on a diet in 1939, to reduce my weight; that's Colonel Roberts' father."

Dr. Anderson testified that he was a dentist, and that the plaintiff came to him as a patient in October, 1939. "At that time he had an impaction of a wisdom tooth on the lower left side. I x-rayed that tooth; following the x-ray the second molar tooth and

the wisdom tooth were both extracted. At the time I extracted those teeth Mr. Jeffers suffered no unusual reaction other than the fact—or rather, after the tooth was removed he made some remark to the effect that he felt the novocaine as much in his foot as he did in his jaw. . . The numbness caused by the medicine used in taking the tooth out can be compared to a similar condition to sitting with my leg crossed and causing the circulation to stop enough to give the sensation of numbness below the point where the circulation stops. The history given me by Mr. Jeffers was a complaining of pain mostly throughout his head and eye. It was my opinion that the tooth could have been responsible for that pain; that's why the tooth was removed."

Dr. Equen testified, in effect, that the plaintiff came to him on January 30, 1940, at his office, complaining of severe headaches; that he "made diagnosis, and the treatments given were: x-ray of sinuses showed involvement of left antrum; nose treated with ephedrine inhalant, compound packs, and spray. No other examination or treatment." On the same day the plaintiff went to Dr. Crawford, who testified that the plaintiff came to him at his office; that he had a persistent frontal headache ("by frontal headache I mean above the eye") of a month's duration; that the headache could have been caused by improper fitting of glasses. Dr. Crawford did not check the plaintiff's eyes. He further testified: "My findings of the nasal examination showed a septal deformity to the right. We transilluminated his sinuses, and they lighted up fairly well. We asked him about an x-ray, but he said he had one made; so we didn't make one. I waited to hear from him, but he didn't send one in." Dr. Allen testified for the defendant, in effect, that he dressed the thumb which Dr. Roberts had lanced several times, presumably because his place of business was between the plaintiff's home and his store, and it was convenient for him to stop there.

The question asked the witness in the application was of a general nature, in that it was asked if he had "been disabled by illness." It was not specific; it was not asked whether he had suffered from a named disease. "Illness, in insurance law, is 'a disease or ailment of such a character as to affect the general soundness and healthfulness of the system seriously, and not a mere temporary indisposition which does not tend to undermine or weaken the constitution of the insured.'" *Southern Life Insurance Co.*

v. *White,* 60 *Ga. App.* 414, 420 (3 S. E. 2d, 849). It does not include mere temporary indisposition which, though requiring medical attention, is readily remediable. 3 Words & Phrases, 70. "In general, it may be said that the test, in determining whether questions contained in an application for insurance are material, is whether the knowledge or the ignorance of the facts sought to be elicited would thereby materially influence the actions of the insurer." *Mutual Benefit Health &c. Asso.* v. *Marsh,* 60 *Ga. App.* 431, 439 (supra). "To void a policy of life insurance upon the ground that the insured made false representations in the application therefor, the insurer must in every case prove that the representations were both untrue and material to the risk. Falsity of such representations, standing alone, will not render the policy void." *Vaughn* v. *National Life & Accident Insurance Co.,* 189 *Ga.* 121 (5 S. E. 2d, 238). "All persons applying for life insurance in a life-insurance company writing life insurance in this State shall submit to such reasonable rules and regulations as may be prescribed by such insurance company; and after a policy shall be issued on the life of such person, the beneficiary of such policy shall be entitled to collect the amount of such policy under the terms of the contract when it shall mature, unless the applicant or beneficiary shall have been guilty of actual fraud or shall have made material misrepresentations in procuring such policy, which representations change the character and nature of the risk as contemplated in the policy so issued by the company. No statements, covenants, or representations contained in applications for insurance shall ever be held or construed to be warranties, but shall be held to be representations only." Code, § 56-908. The misrepresentations referred to in this section are those which constitute actual fraud, or any other misrepresentations which are material to the risk; and the words "material misrepresentations" as there used mean misrepresentations of such character that the knowledge or ignorance of the fact sought to be elicited would thereby influence the action of a prudent insurer in forming its judgment as to whether to accept the risk and what premium to charge, and such that the character and nature of the risk contemplated in the policy were changed from what they would have been if the representations had been true. See Code, § 56-822. In short, "The test of the materiality of a misrepresentation or concealment is that

it influences the insurer in determining whether to accept the risk, and what premium to charge." *Lee* v. *Metropolitan Life Insurance Co.,* 158 *Ga.* 517, 520 (123 S. E. 737).

The evidence authorized a finding that the ailments within the five-year period in question, referred to in the application, were only temporary indispositions which did not tend to undermine or weaken the constitution of the plaintiff. Hence the jury were authorized to find that the answer relative to the part of the question in the application under consideration disclosed only minor or temporary ailments, and that it was not to be considered false under the rules of insurance law. Next, what is the meaning of the latter part of the question which relates to medical or surgical attention during the last five years? We think it means, has the plaintiff, before the signing of the application, received medical or surgical attention for an illness, or accident, or any ailment of such a character as to affect the general soundness and healthfulness of the system seriously? It does not mean a mere temporary indisposition which does not tend to weaken the constitution of the insured, and does not include a mere temporary indisposition which, though requiring medical attention, is readily remediable. To illustrate: the attendance upon a married woman by a physician at the time of *a normal* case of childbirth would not be within the meaning of such a question or provision of the application.

■ The defendant relies strongly on *Mutual Benefit Health &c. Asso.* v. *Marsh,* supra, in which the court was speaking through the writer of the present opinion. That case is distinguishable from the case here, in that while the court called attention to other incidents referred to in the evidence, yet the reason for the reversal was that the plaintiff denied that he had made an application for insurance, when in truth he had made an application only a few days before such denial. The plaintiff also denied that he ever had a policy canceled. This denial also was untrue; and this court, following previous decisions of the Court of Appeals, held that either of these representations, if untrue, would void the policy. In the *Marsh* case this court quoted from *Empire Life Insurance Co.* v. *Jones,* 14 *Ga. App.* 647, 656 (82 S. E. 62), the general rule: "In general, it may be said that the test in determining whether questions in applications for insurance are material is whether the knowledge or ignorance of the facts sought to be elicited would

materially influence the action of the insurer." And from the *Jones* case, as follows: "The materiality of a concealment or representation of fact . . depends, not on the ultimate influence of the fact upon the risk or its relation to the cause of loss, . . but on the immediate influence . . . upon the party . . to whom the communication is made, or is due, in forming his judgment at the time of effecting the contract." The party thus sought to be influenced is generally the insurance company. The court said in effect that the phase of the general rule that a policy might be void where the loss arises from causes totally unconnected with the material fact concealed or misrepresented (the existence of other life insurance, or the cancellation of other policies) was applicable in the *Marsh* case. Another phase of the general rule is that the policy is void where the loss arises from causes connected with the material concealments or misrepresentations. This latter phase of the rule is applicable to the evidence in the instant case; for under that evidence there was nothing which could have influenced the company in forming its judgment at the time of the contract, unless it was the illness or the attendance of a physician during the five years before the signing of the application. The defendant sought to connect the alleged illness previously to the signing of the application with the alleged ailment sued for. Thus, the judge in the present case did not err in charging this latter phase of the general rule, and in not charging the former phase of the general rule, which was applicable to the evidence in the *Marsh* case but not to the evidence in the instant case.

■ Other grounds of the motion for new trial not covered by the principles above discussed are not meritorious.

*Judgment affirmed. Broyles, C. J., and Gardner, J., concur.*